# Exhibit A

FILED 9/2/2022
Justin F. Roebuck
20th Circuit Court

STATE OF MICHIGAN

OTTAWA COUNTY CIRCUIT COURT

| | |
|---|---|
| TOMMY'S EXPRESS, LLC, a Michigan Limited Liability Corporation, and TOMMY CAR WASH SYSTEMS, INC., a Michigan Corporation, <br><br> Plaintiffs, <br><br> v <br><br> ERIC O'CONNOR, an individual, and STEEL BLUE VENTURES, LLC, a Delaware limited liability company, <br><br> Defendants. | Case No. 2022-__6989__-CB <br><br> Hon. <br><br> JON A. VAN ALLSBURG <br><br>  |

Dean F. Pacific (P57086)
Warner Norcross + Judd LLP
150 Ottawa Avenue NW, Suite 1500
Grand Rapids, MI 49503
616.752.2000
dpacific@wnj.com

*Attorneys for Plaintiffs*

There is no other pending or resolved civil action arising out of the transaction or occurrence alleged in the Complaint.

# COMPLAINT

Plaintiffs Tommy's Express, LLC, and Tommy Car Wash Systems, Inc. state their Complaint against Defendant Eric O'Connor as follows:

1

## PARTIES

1.      Plaintiffs Tommy's Express, LLC, and Tommy Car Wash Systems, Inc., are a Michigan limited liability corporation and a Michigan domestic profit corporation, respectively, with offices at 581 Ottawa Ave, Suite 300, Holland, MI 49423.

2.      Defendant Eric O'Connor is an individual and a citizen of Michigan who also maintains a residence at 14800 Lake Olive Dr., Fort Myers, FL, 33919. O'Connor was previously employed by Tommy's Express, LLC, as its Director of Franchise Development until June 8, 2022.

3.      Steel Blue Ventures, LLC ("Steel Blue") is a Delaware limited liability company whose members are Eric O'Connor, Quinton O'Connor, and Aidan O'Connor.

4.      This is a case involving breach of contract, breach of fiduciary duty, tortious interference with a business relationship, unjust enrichment, conversion, and fraud.

## JURISDICTION AND VENUE

5.      Jurisdiction is proper in this Court because the amount in controversy exceeds $25,000 exclusive of interest and costs.

6.      This Court has personal jurisdiction over O'Connor because he transacted business in this State; committed torts against Plaintiffs in this State; and acted as a director of Tommy's Express. MCL 600.705(1), (2), and (6).

7.      This Court has jurisdiction to hear this Complaint and to grant the relief requested.

8.      Venue is proper in Ottawa County pursuant to MCL 600.1629(1)(b) because this action involves claims based on tort that occurred primarily in this County; Plaintiffs reside, have places of business, conduct business, and have its registered office in this County; and the injury occurred primarily in this county.

9.      Additionally, this Court has personal jurisdiction over O'Connor and venue is proper in this County because O'Connor agreed to be subject to "the sole and exclusive personal

2

jurisdiction and venue of the courts seated in Ottawa County, Michigan," in his Confidentiality Agreement that is, in part, the subject of this litigation. (Exhibit 1, Confidentiality Agreement at ¶7.)

## GENERAL ALLEGATIONS

10.     Tommy's Express, a Michigan limited liability corporation, is a car wash franchisor based in Holland, Michigan, with roots dating back more than 60 years. There are nearly 100 Tommy Car Wash franchise locations throughout the United States.

11.     Tommy Car Wash Systems, a Michigan domestic profit corporation, is an equipment sales affiliate of Tommy's Express, with the two Plaintiffs working closely— particularly with respect to franchise development.

12.     As a franchisor, Tommy's Express provides its franchisees with, among other things, branding and equipment packages so that its franchisees can open their own Tommy's Express Car Washes.

13.     O'Connor, as Tommy's Express' Director of Franchise Development, worked directly with potential franchisees to provide information regarding franchising opportunities, including identification of opportunities for new franchise locations, and consult on appropriate territories and particular locations within those territories.

14.     O'Connor had an office in Plaintiffs' headquarters in Holland, Michigan, and regularly operated out of this location.

15.     Because O'Connor's role required knowledge of Plaintiffs' confidential and proprietary information—including strategic goals, methods, and costs—he entered into a Confidentiality Agreement with Plaintiffs and their affiliates on July 31, 2019. (Exhibit 1, Confidentiality Agreement.)

3

FILED 9/2/2022
Justin F. Roebuck
20th Circuit Court

16.     In that Agreement, O'Connor agreed to not solicit any employee or contractor of Plaintiffs during his employment and for one year after the end of his employment, including soliciting employees to terminate their relationship with Plaintiffs, or to otherwise "take any action that adversely affects their ability to discharge their duties to the" Plaintiffs. (*Id.* at ¶1.)

17.     O'Connor also agreed to maintain the confidentiality of Plaintiffs' confidential information—including business contacts, franchisee lists, business methods, workforce information, and research and development methods—agreeing to not use Plaintiffs' confidential information for his own benefit or of any party other than Plaintiffs. (*Id.* at ¶2.)

18.     O'Connor also agreed that he would not "hold any job or engage in any activity for economic benefit that diminishes or otherwise interferes with my ability to provide my full attention and best efforts to my job duties and responsibilities to the" Plaintiffs. (*Id.* at ¶5.)

19.     O'Connor's agreement was supported by the valuable consideration of his continued at-will employment, as well as future salary or benefit adjustments, and/or promotions. (*Id.* at ¶4.)

20.     O'Connor agreed that any breach of the agreement would cause irreparable harm to Plaintiffs, entitling Plaintiffs to not only money damages, but also temporary, preliminary, and permanent injunctive relief, as well as "actual costs and attorney fees incurred by the Company in the enforcement of this Agreement." (*Id.* at ¶6.)

21.     Non-party Blake Peterson, who was Tommy Car Wash System's Director of Project Development, would pick up where O'Connor left off in his franchise development work— Peterson's job included consultation on the real estate development process, including providing resources for working with zoning boards, the general contractor bidding process, and construction.

4

22.     Given their respective roles and duties, O'Connor and Peterson worked closely together while employed by Plaintiffs.

23.     Steve Noll is a Project Manager for Tommy Car Wash Systems.

24.     Peterson was Noll's direct supervisor, but Noll often had direction from O'Connor as well.

25.     One of the three largest franchisees of Tommy's Express is TE Ventures, which has locations all over the country.

26.     Plaintiffs have a strong business relationship with TE Ventures such that if TE Ventures was in the market for franchise development services, Tommy's would have been TE Ventures' go-to resource.

27.     In or around early 2020, Peterson instructed Noll that he was to be tasked with a new opportunity in his role as a Project Manager—to purportedly begin developing a Real Estate Development arm of Plaintiffs, initially in Michigan only but later extended to other regions; this new Real Estate Development business was purportedly to offer turnkey developments for TE Ventures from Tommy.

28.     Following these conversations, Noll's scope of work was greatly expanded beyond that of a conventional Project Manager for Tommy Car Wash Systems, per instructions by O'Connor and Peterson.

29.     Now, instead of assisting and consulting TE Ventures in its developments, Noll was tasked with a far more active and independent role, including coordinating directly with the contractor throughout the site development process, including design and elevation grading; providing contracts to Peterson to sign; due diligence investigation for real properties, including title work and zoning; estimating and planning the construction; meeting with municipal planning

5

commissioners; obtaining municipal approvals; and supervising and managing all construction of the projects.

30.     This was highly unusual for a Project Manager, who generally operate more as consultants and advisors for their franchisees while the franchisees themselves handle the real estate development processes.

31.     To meet this significantly expanded scope of work, Noll expended substantially more time, money, and other of Plaintiffs' resources for each site O'Connor and Peterson tasked him with developing.

32.     As this work progressed, Noll found himself working largely independently, with little input or involvement from TE Ventures, with the only oversight from Tommy's coming from O'Connor and Peterson.

33.     At one point, Noll called Mike Czlonka, TE Ventures' COO, to obtain his input on a piece of real estate for a TE Ventures' project.

34.     On that call, Czlonka stated that he hoped O'Connor—not either Plaintiff or their affiliates—was paying Noll well for all the work he had been doing for TE Ventures, because O'Connor himself was obtaining approximately $100,000 for each newly developed site.

35.     Concerned that O'Connor was doing something inappropriate, Noll told Peterson about Czlonka's statement.

36.     Peterson appeared surprised, and told Noll he would speak with O'Connor; shortly after that, Peterson called Noll back and said he spoke with O'Connor, who confirmed the arrangement, and that Peterson advised O'Connor to straighten it out.

37.     Not long after that, O'Connor, via Peterson, told Noll that this arrangement was previously approved by Alex Lemmen, Plaintiffs' CEO, and was legitimate.

6

38.     These statements by O'Connor and Peterson were false.

39.     Lemmen had not approved this arrangement. Lemmen in fact had no knowledge of it.

40.     Peterson may or may not have had knowledge of O'Connor's scheme and the veracity of his representations.

41.     Not long after that, O'Connor and Peterson came to Noll, indicating that they had lined up a better job for him at TE Ventures, which Noll declined after receiving a written offer.

42.     On or around September 23, 2021, O'Connor took Noll to lunch and offered him a substantial cash payment to not tell anyone about O'Connor's arrangement with TE Ventures. This was only after Noll confronted him about the $100,000 per site payments O'Connor had been receiving.

43.     Even after these attempts at a bribe, O'Connor again falsely told Noll that Lemmen had signed off on this arrangement at that lunch.

44.     About a week later, on or about September 30, 2021, O'Connor took Noll to lunch again, and offered him a payment of $10,000 in cash for each site that Noll helped develop—Noll again declined because of his sense that this arrangement was improper.

45.     Noll repeatedly expressed his desire to get out of this real estate development scheme to both O'Connor and Peterson.

46.     In December 2021, Peterson arranged for TE Ventures to make yet another, higher paying, job offer to Noll. Noll again declined.

47.     After repeated instructions from his superiors, O'Connor and Peterson, who repeatedly indicated that Lemmen had signed off on O'Connor's arrangement, Noll felt that he had no other choice but to continue his expanded scope of work, while asking Peterson to find him

7

a different opportunity within Plaintiffs' businesses so as to distance himself from their suspicious behavior.

48.     In early 2022, a supervisor from Plaintiffs was on a site visit and noticed that Noll's scope of work was unusually expanded.

49.     The supervisor sent a text message to Peterson, asking him about Noll's unusual scope of work.

50.     Almost immediately, the supervisor received a response from O'Connor—not Peterson—that everything was above board.

51.     Following this, Plaintiffs began an internal investigation, and uncovered O'Connor's improper conduct of creating a side business for himself using Plaintiffs' resources, employees, time, good will, and money.

52.     Specifically, O'Connor directed Peterson to take Noll away from legitimate work for Plaintiffs to further O'Connor's own ends, all while he received a salary and benefits from Tommy's Express and used Plaintiffs' resources, including expense reimbursements, at his direction—not to mention the use of O'Connor own time and resources while employed by Tommy's Express.

53.     On June 8, 2022, O'Connor submitted a resignation effective July 1, 2022, which Tommy's Express accepted immediately given his conduct.

54.     Following his resignation, Plaintiffs discovered additional evidence of O'Connor's misconduct on his work computer and work area, including corporate organization documents and contracts to support his schemes—further evidencing his abuse of Plaintiffs' resources for his own gain.

8

55.     O'Connor organized a Delaware LLC, Steel Blue Ventures, LLC. (Exhibit 2, Steel Blue Operating Agreement.)

56.     On information and belief, O'Connor individually and with Steel Blue executed a joint venture agreement with ROC Wash Holdings, LLC, and TE Wash Holdings, LLC (two affiliates of TE Ventures) to identify and develop real estate as Tommy's Express car washes in Eastern Michigan. (Exhibit 3, Joint Venture Agreement.)

57.     The Joint Venture Agreement indicated that Steel Blue would be paid $100,000 for the development of each franchise location, divided between $25,000 upon successful permitting, and $75,000 upon public opening of a completed franchise. (*Id.* at ¶5.)

58.     Although the copies of the Steel Blue Operating Agreement and the Joint Venture Agreement uncovered by Tommy are unsigned, on information and belief they were fully executed, as evidenced by an email from Czlonka to O'Connor, indicating that "three $25k steel blue checks" were en route to O'Connor, *i.e.*, the $75,000 due to O'Connor/Steel Blue upon a public opening under the Joint Venture Agreement. (Exhibit 4, Czlonka Email.)

59.     O'Connor—through Steel Blue—created another corporate entity named Iron Hammer Ventures, LLC, which he created with Peterson—through Loyalist Ventures, LLC— which, on information and belief, may have been involved in O'Connor's schemes. (Exhibit 5, Iron Hammer Agreement.)

60.     Finally, O'Connor also appeared to have entered into a Joint Venture Agreement with ROC Wash, TE Wash, Gulf Coast Car Wash Consultants, LLC, and Reymond Sargenti, to develop Tommy's Express car wash franchises in Lee and Collier Counties, Florida. (Exhibit 6, Florida Joint Venture Agreement.)

61.     O'Connor entered into this agreement both individually and through Gulf Coast

9

Car Wash Consultants, LLC—for which both he and Sargenti are managing members. (*Id.*)

62.     In addition, after O'Connor's employment ended Tommy's discovered that during the course of his employment O'Connor had signed numerous contract amendments or "side agreements" with Tommy's franchisees without Tommy's knowledge or authorization.

63.     Often on the same day that Tommy's President Ryan Essenburg would execute Multi-Unit Development Agreements or Franchise Agreements with a franchisee, O'Connor would execute amendments or other side agreements with the franchisee.

64.     These amendments or side agreements were not authorized by Tommy's.

65.     These amendments or side agreements were not disclosed to Essenburg when he executed the underlying Multi-Unit Development Agreements or Franchise Agreements.

66.     On information and belief, O'Connor engaged in this practice because he knew that the terms requested by the franchisee would not be approved by Tommy's, and so he concealed the amendments or side agreements from Tommy's in order to induce the franchisee and Tommy's to sign the underlying agreements so that he could earn his commission.

67.     O'Connor also presented Franchise Agreements to Essenburg for execution on behalf of Tommy's with knowledge and without disclosing to Essenburg that the new franchise infringed on the territories of an existing franchisee.

68.     On information and belief, O'Conner engaged in this practice because he knew that Essenburg would not approve such a new Franchise Agreement, and so he concealed the infringement from Tommy's in order to induce the franchisee and Tommy's to sign the underlying agreements so that he could earn his commission

69.     Through these efforts, O'Connor abused his role as a corporate officer of Tommy's Express, by stealing and abusing Plaintiffs' resources, employee time, knowledge, skills, and

10

corporate good will, and by acting to advance his own personal financial interest rather than the interest of the company.

## COUNT I – BREACH OF FIDUCARY DUTY/DUTY OF LOYALTY

70.     Plaintiffs incorporate all the preceding paragraphs by reference as if fully set forth herein.

71.     O'Connor, while employed by Tommy's Express as a director, used Plaintiffs' and their affiliates' offices, telephones, computers, printers, other business property, and employees to engage in expanded real estate and franchise development work, and to direct payments resulting from such transactions to himself and/or Peterson and others.

72.     As a director of Tommy's Express, any and all business opportunities related in any way to Tommy's operations that may have come to O'Connor's attention during his employment belonged to Tommy's Express and its affiliated businesses, including Tommy Car Wash Systems—but O'Connor instead diverted business opportunities related to Plaintiffs' core operations for his own benefit.

73.     O'Connor concealed material information from Tommy's concerning Franchise Agreements he presented to Essenburg for signature.

74.     O'Connor acted with the intent to injure or harm Plaintiffs for his own benefit.

75.     O'Connor's conduct, while still employed by Tommy's Express, was in bad faith and constitutes a breach of his fiduciary duties, including the duty of loyalty, to Tommy's Express, Tommy Car Wash Systems, and their affiliates.

76.     As a direct and proximate result of O'Connor's wrongful conduct, Plaintiffs have suffered economic injury and loss in the form of compensation paid to O'Connor himself, in the form of compensation paid to Noll, and in the loss of business expectations comprising the total

11

amounts O'Connor received as a result of his wrongful conduct, including at least $100,000 per site, future lost profits, and interest.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor, and against O'Connor, for money damages in an amount to be proven at trial, for equitable restitution of compensation paid to O'Connor during his period of disloyalty, and all other relief that the Court deems just, equitable, or appropriate under the circumstances.

## COUNT II – TORTIOUS INTERFERENCE WITH PLAINTIFFS' BUSINESS RELATIONSHIP AND PROSPECTIVE ECONOMIC EXPECTATION

77.    Plaintiffs incorporate all the preceding paragraphs by reference as if fully set forth herein.

78.    At all times relevant to this dispute, Plaintiffs had a business relationship with their clients, including TE Ventures, as well as reasonable business and economic expectations.

79.    Plaintiffs had a reasonable expectation that if TE Ventures was in the market for site development services, Plaintiffs would have the opportunity to provide those services.

80.    Plaintiffs had a reasonable expectation that if their employees and resources were deployed to conduct site development services, Plaintiffs would receive any revenue derived from such services.

81.    O'Connor has been aware of these business relationships and business expectations at all relevant times.

82.    Notwithstanding O'Connor's knowledge of Plaintiffs' business relationships or expectations with their clients and customers, O'Connor intentionally sought to interfere with those relationships and expectations, and used Plaintiffs' resources to induce Plaintiffs' clients to terminate their relationships or expected relationships with Plaintiffs.

12

83.     O'Connor, both individually and as a managing member of various LLCs, entered into contracts with affiliates of TE Ventures for turnkey real estate development, using Plaintiffs' resources and employees.

84.     O'Connor's interference is intentional, malicious, and improper, because it occurred based on information and resources he obtained from Plaintiffs.

85.     O'Connor intended to impair Plaintiffs' financial well-being.

86.     As a direct and proximate result of O'Connor's wrongful conduct, Plaintiffs suffered economic injury and loss of business expectations, future lost profits, and interest.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor, and against O'Connor, for money damages in an amount to be proven at trial, and all other relief that the Court deems just, equitable, or appropriate under the circumstances.

## COUNT III – BREACH OF CONTRACT

87.     Plaintiffs incorporate all the preceding paragraphs by reference as if fully set forth herein.

88.     The Confidentiality Agreement between O'Connor and Plaintiffs and their affiliates constitutes a legally binding, enforceable contract.

89.     Plaintiffs performed all of their obligations under the Confidentiality Agreement.

90.     O'Connor breached his obligations by using Plaintiffs' confidential information, including, but not limited to, business contacts, franchisee lists, business methods, workforce information, research and development methods, and territory conflict data, for his own personal gain.

91.     O'Connor also breached his obligations by soliciting Peterson, Noll, and possibly other employees to take actions adversely affecting their ability to perform their duties during

13

their employment with Plaintiffs, and by attempting to persuade Noll to terminate his relationship with Tommy Car Wash Systems.

92.    O'Connor also breached his obligations by engaging in other activities for his own economic benefit that diminished or otherwise interfered with his ability to provide his full attention and best efforts to his job duties and responsibilities to Tommy.

93.    Pursuant to the Confidentiality Agreement, O'Connor is liable for not only money damages, but also equitable relief and Plaintiffs' attorney fees and costs because of his breaches of the Agreement.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor, and against O'Connor, for money damages in an amount to be proven at trial, reasonable attorney's fees and costs, and all other relief that the Court deems just, equitable, or appropriate under the circumstances.

## COUNT IV – UNJUST ENRICHMENT

94.    Plaintiffs incorporate all the preceding paragraphs by reference as if fully set forth herein.

95.    O'Connor benefited by soliciting business away from Plaintiffs and to himself, and/or to Steel Blue, at the expense of Plaintiffs due to their lost resources and employee time.

96.    O'Connor benefited by using Tommy Car Wash Systems employees Peterson and Noll's time, experience, and knowledge, and O'Connor's own time as well as company resources, while employed by Tommy's Express for his own gain and/or Steel Blue's gain.

97.    O'Connor benefitted by executing contract amendments or side agreements with franchisees in order to ensure that he received commission payments, to the detriment of Tommy's and without Tommy's knowledge or authorization.

14

98.    O'Connor benefitted by presenting Franchise Agreements for new franchise sites that infringed on the territories of other franchisees in order to ensure that he received commission payments, to the detriment of Tommy's and without Tommy's knowledge or authorization.

99.    It would be inequitable for O'Connor and Steel Blue to retain the benefit of these transactions.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor, and against O'Connor and Steel Blue, for money damages in an amount to be proven at trial, and all other relief that the Court deems just, equitable, or appropriate under the circumstances.

## COUNT V – COMMON LAW CONVERSION

100.    Plaintiffs incorporate all the preceding paragraphs by reference as if fully set forth herein.

101.    Plaintiffs had an immediate right to the proceeds gained through the sale of real estate development services which resulted from O'Connor's use of Plaintiffs' employees and resources.

102.    O'Connor and/or Steel Blue have intentionally, unlawfully, and without authority taken and asserted dominion over these proceeds, and other property and resources of the Plaintiffs.

103.    O'Connor and/or Steel Blue continue to exert unauthorized dominion and control over these proceeds.

104.    As a direct and proximate result of the wrongful conduct of O'Connor and Steel Blue, Plaintiffs have suffered economic injury in the amount of proceeds gained by O'Connor and/or Steel Blue, including at least $100,000 per site developed.

15

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor, and against O'Connor and Steel Blue, for money damages in an amount to be proven at trial, and all other relief that the Court deems just, equitable, or appropriate under the circumstances.

## COUNT VI – STATUTORY CONVERSION

105. Plaintiffs incorporate all the preceding paragraphs by reference as if fully set forth herein.

106. Plaintiffs had an immediate right to the proceeds gained through the sale of real estate development services which resulted from O'Connor's use of Plaintiffs' employees and resources.

107. O'Connor and/or Steel Blue stole and converted this property, and other property and resources, of Plaintiffs for their own use.

108. O'Connor and/or Steel Blue received, possessed, concealed, and aided in the concealment of this stolen and converted property, knowing full well that the proceeds belonged to Plaintiffs.

109. O'Connor and/or Steel Blue have intentionally, unlawfully, and without authority taken and asserted dominion over these proceeds.

110. O'Connor and/or Steel Blue continue to exert unauthorized dominion and control over these proceeds.

111. As a direct and proximate result of the wrongful conduct of O'Connor and/or Steel Blue, Plaintiffs have suffered economic injury in the amount of proceeds gained by O'Connor and/or Steel Blue, including at least $100,000 per site developed.

16

112.    Under MCL 600.2919a, Plaintiffs are entitled to treble damages, plus costs and reasonable attorney fees as a result of O'Connor and/or Steel Blue's acts of statutory conversion.

WHEREFORE, Plaintiffs request that this Court enter judgment in its favor, and against O'Connor and Steel Blue, for money damages in an amount to be proven at trial, treble damages plus costs and reasonable attorney fees pursuant to MCL 600.2919a, and all other relief that the Court deems just, equitable, or appropriate under the circumstances.

## COUNT VII – FRAUD

113.    Plaintiffs incorporate all the preceding paragraphs by reference as if fully set forth herein.

114.    O'Connor repeatedly made material misrepresentations to Noll, in his capacity as an employee of Tommy Car Wash Systems, including:

   a.  Throughout early 2020, and until O'Connor's resignation in June 2022, that Noll's scope of work for Tommy Car Wash Systems was expanded and he was to develop turnkey real estate development services within his lawful scope of employment with Tommy Car Wash Systems and on behalf of its affiliates;

   b.  At two lunches on September 23 and 30, 2021, that Lemmen, the CEO of Plaintiffs, was aware of the turnkey development services and had agreed to O'Connor's arrangement, including that O'Connor was lawfully entitled to the $100,000 direct payments, and had agreed to Noll's expanded scope of work.

115.    These statements were false.

116.    When O'Connor made the statements, he knew that they were false.

17

117.    O'Connor made the statements with the intent that Noll, in his capacity as an employee of Tommy Car Wash Systems and in the interest of its affiliates, including Tommy's Express, would not investigate further or communicate with other executives at Plaintiffs and their affiliates about O'Connor's arrangement with TE Ventures.

118.    Noll, in his capacity as an employee of Tommy Car Wash Systems, acted in reliance on these statements and did not immediately contact other executives with Plaintiffs or otherwise further investigate O'Connor's scheme.

119.    As a result of Noll's reliance on the misrepresentations, Plaintiffs were not able to uncover O'Connor's scheme until much later, and, as a direct and proximate result, suffered repeated injuries as O'Connor continued to use Plaintiffs' resources for their own benefit and gains, including all proceeds from the turnkey development services.

120.    In addition, as set forth more fully in paragraphs 62-68 above, O'Connor made material misrepresentations to Essenburg each time that he presented a Multi-Unit Development Agreement or Franchise Agreement for execution without disclosing that O'Connor had executed (or planned to execute) amendments or other side agreements with the franchisee, or that such Franchise Agreement infringed upon the territory of another franchisee.

121.    In the alternative, O'Connor omitted materials facts that he owed a duty to disclose each time that he presented to Essenburg a Multi-Unit Development Agreement or Franchise Agreement for execution without disclosing that O'Connor had executed (or planned to execute) amendments or other side agreements with the franchisee, or that such Franchise Agreement infringed upon the territory of another franchisee.

18

122.   When O'Connor made these misrepresentations he knew that they were false.

123.   O'Connor failed or refused to disclose materials facts that he owed a duty to disclose, knowing that they were material.

124.   O'Connor made these misrepresentations, and/or omitted these material facts, with the intent that Essenburg rely on them and execute Multi-Unit Development Agreements and/or Franchise Agreements to enhance O'Connor's commission earnings.

125.   Essenburg did in fact rely on O'Connor's statements in executing the Multi-Unit Development Agreements and/or Franchise Agreements.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor, and against O'Connor, for money damages in an amount to be proven at trial, for equitable restitution of compensation paid to O'Connor as a result of his fraudulent actions, and all other relief that the Court deems just, equitable, or appropriate under the circumstances.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that the Court:

a.   Enter judgment in its favor and against O'Connor and Steel Blue for money damages in an amount to be proven at trial, with interest;

b.   Award treble damage pursuant to MCL 600.2919a;

c.   Award equitable restitution of compensation paid to O'Connor during the period that he breached his duty of loyalty, or paid to O'Connor as a result of his fraud;

d.   Award Plaintiffs their reasonable attorney fees and costs, pursuant to O'Connor's Confidentiality Agreement and pursuant to MCL 600.2919a; and

19

e.  Grant any other relief that the Court deems just, equitable, or appropriate under

the circumstances.

Respectfully submitted,

WARNER NORCROSS + JUDD LLP

Dated: September 2, 2022            By_____

Dean F. Pacific (P57086)
WARNER NORCROSS + JUDD LLP
150 Ottawa Avenue NW, Suite 1500
Grand Rapids, MI 49503
616.752.2000
dpacific@wnj.com
*Attorneys for Plaintiff*

20

1

FILED 9/2/2022
Justin F. Roebuck
20th Circuit Court

# EXHIBIT 1

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement ("Agreement") is made this [31] day of [July], 20[19], between Essenburg Car Wash of Holland, Inc. (which operates under the brand, "VisionQuest"), its affiliates, subsidiaries, joint ventures, acquisitions, successors and assigns, including but not limited to Tommy's Express Car Wash, Quality Car Wash, and Tommy Car Wash Systems (hereinafter referred to as the "Company") and [Eric J O'Connor] (in this Agreement, "I" or "me").

I acknowledge that, in the course of my employment with the Company, I will have access to confidential and proprietary information concerning the Company, that the Company obtains an important business advantage because this information is not generally known to other participants in the industry in which the Company does business or to others who could make use of that information, and that the Company takes reasonable measures to maintain the confidentiality of this information. I therefore acknowledge that the following restrictions are reasonable to protect the Company's legitimate business interests in its business information, its relationships, and its investment in me.

1.    Non-Solicitation.  During the term of my employment and for a period of one year after the end of my employment, I will not hire, solicit, encourage or persuade any Team Member or contractor of the Company to terminate their relationship with the Company or to take any action that adversely affects their ability to discharge their duties to the Company.

2.    Non-Disclosure of Confidential Information.  "Confidential Information" means any and all information related to the business of the Company that is not generally available to the public or in the industry.  Confidential Information includes, but is not limited to, information concerning: corporate planning and strategy; financial matters; management structure; business contacts; guests or members and related lists; guest or member preferences or requirements; contracts; vendors and suppliers; franchisees and franchisee lists; franchise strategy, structure, setup, and systems; end user application strategy; pricing and promotional materials; marketing and sales; architectural design, plans and specifications; mechanical and material components and settings for car washes; the source, substance and application of business technology, including hardware, software, programs and applications; business methods, processes and improvements; Team Members and potential Team Members, independent contractors, temporary labor and other workforce information; research and development; sales and service records; operating reports, audits, diagnostics, proposals and recommendations; bidding and billing; drawings and specifications; products and materials; legally privileged matters; patented information; any information constituting a trade secret;

and any other information relating to the business of the Company obtained during my employment with the Company.

Confidential Information does not include any information which has been voluntarily disclosed to the public by the Company (except where such disclosure has been made without authorization) or any information which was otherwise available in the public domain in the same or similar form before any use or disclosure by me that would constitute a violation of this Agreement.

Confidential Information is and will remain the sole property of the Company. I will treat all Confidential Information as strictly confidential. I will not disclose Confidential Information to any other person or entity (except during my employment and to the extent required by the appropriate and expected discharge of my duties for the Company), or use such information for the benefit of me or any party other than the Company. Upon the end of employment, I shall immediately return to the Company all documents or materials which are the property of the Company or which contain any Confidential Information, regardless of form or medium and including all reproductions of such documents or materials. Additionally, after the end of my employment, I will not engage in any activity that involves or results in the use or disclosure of any Confidential Information or intellectual property.

Nothing in this Agreement will be interpreted to prohibit me from making truthful statements when compelled to provide information by a subpoena, court order or other valid legal obligation. I will notify the Company immediately upon receiving notice of a subpoena, court order or other legal obligation that may require disclosure of Confidential Information, so that the Company may take lawful steps to protect against any unnecessary, overbroad or unlawful disclosure or use of Confidential Information.

3. **Inventions, Ideas, and Patents.** I agree that any intellectual property including any inventions, trade secrets, trademarks, copyrightable material, or improvement of any of the foregoing (collectively "Intellectual Property"), which I conceive, make, invent, or suggest, either solely or jointly with others, during my employment by the entity of the Company relating to any matter or thing which may be connected in any way with my work or the business of the Company, existing or anticipated, is the exclusive property of the entity of the Company by which I am employed at the time it is conceived, made, invented, or suggested, either solely or jointly with others. I further agree that all Intellectual Property, and particularly copyrightable materials, are considered a "Work Made for Hire" for the benefit of that entity under any applicable United States and/or any foreign intellectual property laws, and in the event any work so created is not found to be a "Work Made for Hire" for the benefit of that entity, I agree it is the exclusive Intellectual Property of the entity of the Company. I hereby assign all of my rights, title and interest in and to said Intellectual Property to that entity of the Company executing this agreement, by which I am employed, immediately upon the Intellectual Property's creation, and further waive any moral rights or rights of attribution therein.

I agree to provide reasonable notice to the Company of the existence of such Intellectual Property, and to execute and deliver to the Company such instruments of assignment or other documents as its legal counsel requests in connection with the perfection, protection or enforcement of its rights to the Intellectual Property hereunder regardless of my employment status with the Company.

4.    Employment.  I agree to be bound by the terms and conditions of this Agreement in consideration for my at-will employment by the Company, my participation in any future salary or benefit adjustments and/or promotions and other valuable consideration, the receipt and sufficiency of which is acknowledged by me and the Company.

5.    Outside Employment. During the term of my employment with the Company, I will not hold any job or engage in any activity for economic benefit that diminishes or otherwise interferes with my ability to provide my full attention and best efforts to my job duties and responsibilities to the Company.

6.    Remedies.  I acknowledge that any breach of the terms of Paragraphs 1 and 2 by me will cause irreparable harm to the Company and that money damages would not be sufficient to provide a fully adequate remedy for such a breach.  Therefore, in the event of a breach or threatened breach of any term of Paragraphs 1 or 2, the Company shall be entitled to temporary, preliminary and permanent injunctive relief without any requirement of bond, in addition to any other legal or equitable remedies. I shall be responsible to pay for the actual costs and attorney fees incurred by the Company in the enforcement of this Agreement.

7.    Jurisdiction.  This Agreement shall be governed in all respects by Michigan law without regard to its conflict of laws principles.  The parties agree that they shall be subject to the sole and exclusive personal jurisdiction and venue of the courts seated in Ottawa County, Michigan, regardless of where the Company or I may be located at the time any action may be commenced.

8.    Assignment.    This Agreement is for the benefit of the Company and its successors and assigns.

9.    Entire Agreement.    This Agreement states the entire agreement between the Company and me relating to these matters and supersedes any and all prior employment agreements between us that are inconsistent with its terms.  Any modification of this Agreement must be made in writing and signed by me and an officer of the Company.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day, month and year first written above.

Team Member

_____

Signature

Eric J O'Connor

_____

Print Name

ESSENBURG CAR WASH OF HOLLAND, INC.

By_____

Its_____



New Visionquest Handbook Confidentiality Agreement Sign Off.pdf

Document ID: 668df218-b470-11e9-85e0-bc764e100f94

**Requested:**
Jul 31, 2019, 11:11 AM EDT (Jul 31, 2019, 3:11 PM UTC)
Juan Rodriguez (jrodriguez@qcwteam.com)
IP: 69.87.136.234

**Signed:**
Jul 31, 2019, 12:31 PM EDT (Jul 31, 2019, 4:31 PM UTC)
Eric O'Connor (erico@tommys-express.com)
IP: 69.87.136.234

**Signed:**
Aug 1, 2019, 11:24 AM EDT (Aug 1, 2019, 3:24 PM UTC)
Jennifer Weenum (jennifer@qualitywash.com)
IP: 69.87.136.234

2

FILED 9/2/2022
Justin F. Roebuck
20th Circuit Court

# EXHIBIT 2

## Operating Agreement
## of
## Steel Blue Ventures, LLC
## a Delaware Limited Liability Company

THIS OPERATING AGREEMENT of Steel Blue Ventures, LLC (the "Company") is entered into as of the date set forth on the signature page of this Agreement by each of the Members listed on Exhibit A of this Agreement.

A.      The Members have formed the Company as a Delaware limited liability company under the Delaware Limited Liability Company Act. The purpose of the Company is to conduct any lawful business for which limited liability companies may be organized under the laws of the state of Delaware. The Members hereby adopt and approve the articles of organization of the Company filed with the Director of the Delaware Department of Labor and Economic Growth.

B.      The Members enter into this Agreement to provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.

## ARTICLE 1: DEFINITIONS

Capitalized terms used in this Agreement have the meanings specified in this Article 1 or elsewhere in this Agreement and if not so specified, have the meanings set forth in the Delaware Limited Liability Company Act.

"Agreement" means this Operating Agreement of the Company, as may be amended from time to time.

"Capital Account" means, with respect to any Member, an account consisting of such Member's Capital Contribution, (1) increased by such Member's allocated share of income and gain, (2) decreased by such Member's share of losses and deductions, decreased by any distributions made by the Company to such Member, and otherwise adjusted as required in accordance with applicable tax laws.

"Capital Contribution" means, with respect to any Member, the total value of cash and the fair market value of property other than cash, and (2) services that are contributed and/ or agreed to be contributed to the Company by such Member, as listed on Exhibit A, as may be updated from time to time according to the terms of this Agreement.

"Managing Manager" means the Person who has authority to manage the business and affairs of the Company pursuant to this Agreement.

"Member" means each Person who acquires Membership Interest pursuant to this Agreement. The Members are listed on Exhibit A, as may be updated from time to time according to the terms of this Agreement. Each Member has the rights and obligations

specified in this Agreement.

"Membership Interest" means the entire ownership interest of a Member in the Company at any particular time, including the right to any and all benefits to which a Member may be entitled as provided in this Agreement and under the Delaware Limited Liability Company Act, together with the obligations of the Member to comply with all of the terms and provisions of this Agreement.

"Ownership Interest" means the Percentage Interest, as applicable, based on the manner in which relative ownership of the Company is divided.

"Percentage Interest" means the percentage of ownership in the Company owned by each Member as set forth in Exhibit A, as may be amended from time to time pursuant to this Agreement.

"Person" means an individual (natural person), partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

"Voting Interest" shall mean the number of votes to which each Member is entitled on any vote brought before the Members, which shall be equal to the number of percentage points of Ownership Interest each Member bears as set forth in Exhibit A, as may abe amended from time to time pursuant to this Agreement.

## ARTICLE 2: CAPITAL CONTRIBUTIONS, ADDITIONAL MEMBERS, CAPITAL ACCOUNTS AND LIMITED LIABILITY

2.1     Initial Capital Contributions. The names of all Members and each of their respective addresses, initial Capital Contributions, and Ownership Interests must be set forth on Exhibit A. Each Member has made or agrees to make the initial Capital Contribution set forth next to such Member's name on Exhibit A to become a Member of the Company.

2.2     Subsequent Capital Contributions. Members are not obligated to make additional Capital Contributions unless unanimously agreed by all the Members. If subsequent Capital Contributions are unanimously agreed by all the Members, the Members shall make such additional Capital Contributions on a pro rata basis in accordance with each Member's respective Percentage Interest or as otherwise unanimously agreed by the Members.

2.3     Additional Members.

A.     With the exception of a transfer of interest (1) governed by Article 7 of this Agreement or (2) otherwise expressly authorized by this Agreement,

OPERATING AGREEMENT OF STEEL BLUE VENTURES, LLC                    PAGE 2 OF 11

additional Persons may become Members of the Company and be issued additional Ownership Interests only if approved by and on terms determined by unanimous agreement of the existing Members.

B.     Before a Person may be admitted as a Member of the Company, that Person must sign and deliver to the Company the documents and instruments, in the form and containing the information required by the Company, that the Managers deem necessary or desirable. Membership Interests of new Members will be allocated according to the terms of this Agreement.

2.4     Capital Accounts. Individual Capital Accounts must be maintained for each Member, unless (a) there is only one Member of the Company and (b) the Company is exempt according to applicable tax laws. Capital Accounts must be maintained in accordance with all applicable tax laws.

2.5     Interest. No interest will be paid by the Company or otherwise on Capital Contributions or on the balance of a Member's Capital Account.

2.6     Limited Liability; No Authority. A Member will not be bound by, or be personally liable for, the expenses, liabilities, debts, contracts, or obligations of the Company, except as otherwise provided in this Agreement or as required by the Delaware Limited Liability Company Act. Unless expressly provided in this Agreement, no Member, acting alone, has any authority to undertake or assume any obligation, debt, or responsibility, or otherwise act on behalf of, the Company or any other Member.

## ARTICLE 3: ALLOCATIONS AND DISTRIBUTIONS

3.1     Allocations. Unless otherwise agreed to by the majority of the Members any income, gain, loss, deduction, or credit of the Company will be allocated for accounting and tax purposes on a pro rata basis in proportion to the respective Percentage Interest held by each Member and in compliance with applicable tax laws.

3.2     Distributions. The Company will have the right to make distributions of cash and property to the Members on a pro rata basis in proportion to the respective Percentage Interest held by each Member. The timing and amount of distributions will be determined by the Manager in accordance with the Delaware Limited Liability Company Act, provided that not later than ninety (90) days following the end of the Company's fiscal year, the Company shall make a distribution to each Member in proportion to its Membership Interest in an amount necessary to cover any taxes due from such Member (or such Member's principal(s)) to federal, state, or local tax authorities as a result of such Member's Membership Interest.

FILED 9/2/2022
Justin F. Roebuck
20th Circuit Court

    3.3    <u>Limitations on Distributions</u>. The Company must not make a distribution to a Member if, after giving effect to the distribution:

    A.    The Company would be unable to pay its debts as they become due in the usual course of business; or

    B.    The fair value of the Company's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of Members, if any, whose preferential rights are superior to those of the Members receiving the distribution.

## ARTICLE 4: MANAGEMENT

**4.1**    <u>Management</u>.

Generally. Subject to the terms of this Agreement and the Delaware Limited Liability Company Act, the business and affairs of the Company will be managed by the Manager, who shall be selected by the vote of a majority of the Voting Interests. The Company shall have one (1) manager. Eric J O'Connor. is hereby appointed the Managing Manager, to serve in such capacity indefinitely, subject to his death, removal or resignation in accordance with this Agreement.

    A.    Certain Decisions Requiring Member Approval. The following matters require unanimous approval of the Members to constitute an act of the Company:

    (i)    A material change in the purposes or the nature of the Company's business;

    (ii)    With the exception of a transfer of interest governed by Article 7 of this Agreement, the admission of a new Member or a change in any Member's Membership Interest, Ownership Interest, Percentage Interest, or Voting Interest in any manner other than in accordance with this Agreement;

    (iii)    The merger of the Company with any other entity or the sale of all or substantially all of the Company's assets; and

    (iv)    The amendment of this Agreement.

**4.2**    <u>Meetings</u>. Regular meetings of the Members or the Managers are not

required but may be held at such time and place as the Members or Managers, respectively deem necessary. Meetings may take place in person, by conference call, or by any other means permitted under the Delaware Limited Liability Company Act. In addition, Company actions requiring a vote may be carried out without a meeting if all of the members consent in writing to approve the action.

**4.3**  Officers. The members are authorized to appoint one or more officers from time to time. The officers will have the titles, the authority, exercise the powers, and perform the duties that the members determine from time to time. Each officer will continue to perform and hold office until such time as (a) the officer's successor is chosen and appointed by the members; or (b) the officer is dismissed or terminated by the members, which termination will be subject to applicable law and, if an effective employment agreement exists between the officer and the Company, the employment agreement. Subject to applicable law and the employment agreement (if any), each officer will serve at the direction of Managing Manager, and may be terminated, at any time and for any reason, by the Managing Manager.

## ARTICLE 5: ACCOUNTS AND ACCOUNTING

5.1  Accounts. The Company must maintain complete accounting records of the Company's business, including a full and accurate record of each Company transaction. The records must be kept at the Company's principal executive office and must be open to inspection and copying by Members during normal business hours upon reasonable notice by the Members wishing to inspect or copy the records or their authorized representatives, for purposes reasonably related to the Membership Interest of such Members. The costs of inspection and copying will be borne by the respective Member.

5.2  Records. The Manager will keep or cause the Company to keep the following business records.

A.  An up-to-date list of the Members, each of their respective full legal names, last known business or residence address, Capital Contributions, the amount and terms of any agreed upon future Capital Contributions, and Ownership Interests, and Voting Interests;

B.  A copy of the Company's federal, state, and local tax information and income tax returns and reports, if any, for the six most recent taxable years;

C.  A copy of the articles of organization of the Company, as may be amended from time to time ("Articles of Organization"); and

D.  An original signed copy, which may include counterpart signatures, of this Agreement, and any amendments to this Agreement, signed by all then-current Members.

5.3  Income Tax Returns. Within 45 days after the end of each taxable year, the

OPERATING AGREEMENT OF STEEL BLUE VENTURES, LLC                    PAGE 5 OF 11

Company will use its best efforts to send each of the Members all information necessary for the Members to complete their federal and state tax information, returns, and reports and a copy of the Company's federal, state, and local tax information or income tax returns and reports for such year.

5.4     Subchapter S Election. The Company may, upon unanimous consent of the Members, elect to be treated for income tax purposes as an S Corporation. This designation may be changed as permitted under the Internal Revenue Code Section 1362(d) and applicable Regulation(s).

5.5     Tax Matters Member. Anytime the Company is required to designate or select a tax matters partner or partnership representative, pursuant to Section 6223 of the Internal Revenue Code and any regulations issued by the Internal Revenue Service, the Members must designate one of the Members as the tax matters partner or partnership representative of the Company and keep such designation in effect at all times.

5.6     Banking. All funds of the Company must be deposited in one or more bank accounts in the name of the Company with one or more recognized financial institutions. The Managing Manager is authorized to establish such accounts and complete, sign, and deliver any banking resolutions reasonably required by the respective financial institutions in order to establish an account.

## ARTICLE 6: MEMBERSHIP - VOTING AND MEETINGS

6.1     Members and Voting Rights. The Members have the right and power to vote on all matters with respect to which the Articles of Organization, this Agreement, or the Delaware Limited Liability Company Act requires or permits. Unless otherwise stated in this Agreement (for example, in Section 4.1(c)) or required under the Delaware Limited Liability Company Act, the vote of the Members holding at least a majority of the Voting Interest of the Company is required to approve or carry out an action.

6.2     Meetings of Members. Annual, regular, or special meetings of the Members are not required but may be held at such time and place as the Members deem necessary or desirable for the reasonable management of the Company. A written notice setting forth the date, time, and location of a meeting must be sent at least ten (10) days but no more than sixty (60) days before the date of the meeting to each Member entitled to vote at the meeting. A Member may waive notice of a meeting by sending a signed waiver to the Company's principal executive office or as otherwise provided in the Delaware Limited Liability Company Act. In any instance in which the approval of the Members is required under this Agreement, such approval may be obtained in any manner permitted by the Delaware Limited Liability Company Act, including by conference call or similar communications equipment. Any action that could be taken at a meeting may be approved by a consent in writing that describes the action to be taken and is signed by Members holding the minimum Voting Interest required to approve the action. If any action is taken without a meeting and without unanimous written consent of the Members, notice of such

action must be sent to each Member that did not consent to the action.

## ARTICLE 7: WITHDRAWAL AND TRANSFERS OF MEMBERSHIP INTERESTS

7.1     Withdrawal. Members may withdraw from the Company prior to the dissolution and winding up of the Company (a) by transferring or assigning all of their respective Membership Interests pursuant to Section 7.2 below, or (b) if all of the Members unanimously agree in a written consent. Subject to the provisions of Article 3, a Member that withdraws pursuant to this Section 7.1 will be entitled to a distribution from the Company in an amount equal to such Member's Capital Account.

7.2     Restrictions on Transfer; Admission of Transferee. A Member may not transfer any Membership Interests, whether now owned or later acquired, unless Members holding all of the Percentage Interests not subject to transfer consent to such transfer. A person may acquire Membership Interests directly from the Company upon the written consent of all Members. A Person that acquires Membership Interests in accordance with this Section 7.2 will be admitted as a Member of the Company only after the requirements of Section 2.3(b) are complied with in full.

## ARTICLE 8: DISSOLUTION

8.1     Dissolution. The Company will be dissolved upon the first to occur of the following events:

A.     The unanimous agreement of all Members in a consent in writing to dissolve the Company;

B.     Entry of a decree of judicial dissolution under Section 450-4802 of the Delaware Limited Liability Company Act;

C.     At any time that there are no Members, unless and provided that the Company is not otherwise required to be dissolved and wound up, within 90 days after the occurrence of the event that terminated the continued membership of the last remaining Member, the legal representative of the last remaining Member agrees in writing to continue the Company and (i) to become a Member; or (ii) to the extent that the last remaining Member assigned its interest in the Company, to cause the Member's assignee to become a Member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member;

D.     The sale or transfer of all or substantially all of the Company's assets;

E.     A merger or consolidation of the Company with one or more entities in which the Company is not the surviving entity.

8.2    No Automatic Dissolution Upon Certain Events. Unless otherwise set forth in this Agreement or required by applicable law, the death, incapacity, disassociation, bankruptcy, or withdrawal of a Member will not automatically cause a dissolution of the Company.

## ARTICLE 9: INDEMNIFICATION

9.1    Indemnification. The Company has the power to defend, indemnify, and hold harmless any Person who was or is a party, or who is threatened to be made a party, to any Proceeding (as that term is defined below) by reason of the fact that such Person was or is a Member, Manager, officer, employee, representative, or other agent of the Company, or was or is serving at the request of the Company as a director, Manager, Governor, officer, employee, representative or other agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise (each such Person is referred to as a "Company Agent"), against Expenses (as that term is defined below), judgments, fines, settlements, and other amounts (collectively, "Damages") to the maximum extent now or hereafter permitted under Michigan law. "Proceeding," as used in this Article 9, means any threatened, pending, or completed action, proceeding, individual claim or matter within a proceeding, whether civil, criminal, administrative, or investigative. "Expenses," as used in this Article 9, includes, without limitation, court costs, reasonable attorney and expert fees, and any expenses incurred relating to establishing a right to indemnification, if any, under this Article 9.

9.2    Mandatory. The Company must defend, indemnify and hold harmless a Company Agent in connection with a Proceeding in which such Company Agent is involved if, and to the extent, Michigan law requires that a limited liability company indemnify a Company Agent in connection with a Proceeding.

9.3    Expenses Paid by the Company Prior to Final Disposition. Expenses of each Company Agent indemnified or held harmless under this Agreement that are actually and reasonably incurred in connection with the defense or settlement of a Proceeding may be paid by the Company in advance of the final disposition of a Proceeding if authorized by a vote of the Members that are not seeking indemnification holding a majority of the Voting Interests (excluding the Voting Interest of the Company Agent seeking indemnification) or a majority of the members that are not seeking indemnification, as the case may be. Before the Company makes any such payment of Expenses, the Company Agent seeking indemnification must deliver a written undertaking to the Company stating that such Company Agent will repay the applicable Expenses to the Company unless it is ultimately determined that the Company Agent is entitled or required to be indemnified and held harmless by the Company (as set forth in Sections 9.1 or 9.2 above or as otherwise required by applicable law).

## ARTICLE 10: GENERAL PROVISIONS

10.1    Notice.    (a)    Any    notices    (including    requests,    demands,    or    other

communications) to be sent by one party to another party in connection with this Agreement must be in writing and delivered personally, by reputable overnight courier, or by certified mail (or equivalent service offered by the postal service from time to time) to the following addresses or as otherwise notified in accordance with this Section: (i) if to the Company, notices must be sent to the Company's principal executive office; and (ii) if to a Member, notices must be sent to the Member's last known address for notice on record. (b) Any party to this Agreement may change its notice address by sending written notice of such change to the Company in the manner specified above. Notice will be deemed to have been duly given as follows: (i) upon delivery, if delivered personally or by reputable overnight carrier or (ii) five days after the date of posting if sent by certified mail.

10.2  Entire Agreement; Amendment. This Agreement along with the Articles of Organization (together, the "Organizational Documents"), constitute the entire agreement among the Members and replace and supersede all prior written and oral understandings and agreements with respect to the subject matter of this Agreement, except as otherwise required by the Delaware Limited Liability Company Act. There are no representations, agreements, arrangements, or undertakings, oral or written, between or among the Members relating to the subject matter of this Agreement that are not fully expressed in the Organizational Documents. This Agreement may not be modified or amended in any respect, except in a writing signed by all of the Members, except as otherwise required or permitted by the Delaware Limited Liability Company Act.

10.3  Governing Law; Severability. This Agreement will be construed and enforced in accordance with the laws of the state of Michigan. If any provision of his Agreement is held to be unenforceable by a court of competent jurisdiction for any reason whatsoever, (i) the validity, legality, and enforceability of the remaining provisions of this Agreement (including without limitation, all portions of any provisions containing any such unenforceable provision that are not themselves unenforceable) will not in any way be affected or impaired thereby, and (ii) to the fullest extent possible, the unenforceable provision will be deemed modified and replaced by a provision that approximates the intent and economic effect of the unenforceable provision and the Agreement will be deemed amended accordingly.

10.4  Further Action. Each Member agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

10.5  No Third-Party Beneficiary. This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other Person or entity will have or acquire any right by virtue of this Agreement. This Agreement will be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

10.6  Incorporation by Reference. The recitals and each appendix, exhibit, schedule, and other document attached to or referred to in this Agreement are hereby incorporated into this Agreement by reference.

10.7   <u>Counterparts</u>. This Agreement may be executed in any number of counterparts with the same effect as if all of the Members signed the same copy. All counterparts will be construed together and will constitute one agreement.

[SIGNATURE PAGE FOLLOWS]

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Operating Agreement and do each hereby represent and warrant that their respective signatory, whose signature appears below, has been and is, on the date of this Agreement, duly authorized to execute this Agreement.

**Steel Blue Ventures, LLC**

Date: _____

_____
By: Eric O'Connor, its Managing Member

**Quinton O'Connor**

Date: _____

_____
By: Quinton OConnor, member

**Aidan O'Connor**

Date: _____

_____
By Aidan OConnor, member

The Company: **Steel Blue Ventures, LLC**

Date: _____

_____
By: Eric O'Connor, its Manager

EXHIBIT A
to Operating Agreement of
Steel Blue Ventures, LLC

The Members of the Company and their respective addresses, Capital Contributions, and Ownership Interests are set forth below. The Members agree to keep this Exhibit A current and updated in accordance with the terms of this Agreement:

| Member's Name and Address | Initial Capital Contribution | Membership Interest |
|---|---|---|
| Eric OConnor | $800.00 | 80% |
| Quinton D O'Connor | $100.00 | 10% |
| Aidan C O'Connor | $100.00 | 10% |

FILED 9/2/2022
Justin F. Roebuck
20th Circuit Court

3

FILED 9/2/2022
Justin F. Roebuck
20th Circuit Court

# EXHIBIT 3

FILED 9/2/2022
Justin F. Roebuck
20th Circuit Court



ROC Wash Holdings, LLC  |  1170 Pittsford Victor Rd., Suite 260  |  Pittsford, NY 14534  |  Ph: 585.270.0941

~~ROC Wash Holdings, LLC~~
~~TE Wash Holdings, LLC~~
~~1170 Pittsford Victor Road~~
~~Pittsford, New York 14534~~

| | |
|---|---|
| | **Formatted:** Left |
| | **Formatted:** Superscript |

~~November ___, 2020~~March 24th, 2021

Mr. Eric O'Connor
Steel Blue Ventures, LLC
[address]4027 Tom Morris Dr., NE
Belmont, MI  49306

Re:    Joint Venture for Development of Tommy's Express Car Washes in Eastern Michigan

Dear Eric:

This letter agreement (this "Agreement") sets forth the terms ~~on~~ and conditions on which ROC Wash Holdings, LLC, a Delaware limited liability company ("ROC Wash"), TE Wash Holdings, LLC, a Delaware limited liability company ("TE Wash"), Steel Blue Ventures, LLC, a [——————][Michigan?] limited liability company ("Steel Blue"), and Eric O'Connor ("Eric") shall jointly develop Tommy's Express car wash franchises ("Franchises") in Eastern Michigan.

ROC Wash and TE Wash were formed on June 30, 2020 for the purpose of developing, owning and operating Franchises. To date, ROC Wash has entered into Multi-Unit Development Agreements (the "Existing Development Agreements") with Tommy's Express, LLC, a Michigan limited liability company (the "Franchisor"), pursuant to which ROC Wash has been granted, on the terms and subject to the conditions set forth therein, exclusive rights to develop Franchises in specified counties in Pennsylvania, West Virginia, Connecticut and North Carolina (the "Existing Development Areas").

Eric is employed by the Franchisor as its Director of Franchise Development and has advised ROC Wash of the opportunity to develop Franchises in Eastern Michigan. Eric's experience with the Franchisor, and with the car wash industry in Eastern Michigan, make him uniquely suited to join with ~~the~~ ROC Wash in the development of Franchises there.

In consideration of the foregoing, the covenants and agreements set forth below, and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

{8306782:4 }

Mr. Eric O'Connor
Page 2
November __, 2020

1.      ROC Wash will use commercially reasonable efforts to enter into a Multi-Unit Development Agreement (the "Michigan Development Agreement") with the Franchisor, pursuant to which the Franchisor shall grant to ROC Wash, on the terms and subject to the conditions set forth therein, the exclusive rights to develop Franchises in the suburbs of Detroit and elsewhere in Eastern Michigan (the territory in which ROC Wash is granted the exclusive right to develop Franchises under the Michigan Development Agreement is the "Michigan Development Area" and Franchises developed under the Michigan Development Agreement are "Michigan Franchises").

2.      Subject to the execution and delivery of the Michigan Development Agreement, ROC Wash shall use commercially reasonable efforts to develop Michigan Franchises in the Michigan Development Area in accordance with the development schedule set forth in the Michigan Development Agreement (the "Michigan Development Schedule"); provided, however, that ROC Wash shall have no obligation to develop more than ten (10) Michigan Franchises unless and until the following performance targets are achieved (the "Michigan Franchise Performance Targets"):

(i)     the average number of annual memberships sold by the first ten (10) Michigan Franchises for the most recently completed fiscal year is equal to or greater than 3,000 per Michigan Franchise; and

(ii)    each of the first ten (10) Michigan Franchises has annual earnings before interest, taxes, depreciation, and amortization greater than or equal to 40% of its annual total revenue for the most recently completed fiscal year.

3.      Each Michigan Franchise shall be developed on real property owned or leased by a newly formed wholly-owned subsidiary of ROC Wash (each a "Real Property Company"). ROC Wash shall bear all costs of acquiring the real property on which any Michigan Franchise is to be developed and all costs of developing, constructing and fully equipping each Michigan Franchise so that it can be leased on a turn-key basis to the operator. Each Michigan Franchise shall be operated by a newly-formed Delaware limited liability company owned (as described in more detail below) by TE Wash and Steel Blue (each an "Operating Company") under a triple net lease by and between the applicable Real Property Company and Operating Company in the form attached hereto as Exhibit A. The terms and parameters of this lease are outlined and agreed upon by both parties as attached hereto as Exhibit B.

4.      Each Operating Company shall be governed by a limited liability company agreement in the form attached hereto as Exhibit CB (each an "LLC Agreement"). Each of the first ten (10) Operating Companies shall be owned 70% by TE Wash and 30% by Steel Blue. Each Operating Company in addition to the first ten (10) (if any) shall be owned 50% by TE Wash and 50% by Steel Blue.

5.      Steel Blue and Eric shall use commercially reasonable efforts to identify exceptional locations within the Michigan Development Area for Michigan Franchises and to cooperate with ROC Wash to coordinate the acquisition of real property and the development and construction and equipping of Michigan Franchises by ROC Wash. In consideration of such services, ROC Wash shall pay to Steel Blue a fee of $100,000 for the development of each

{8306782:4 }

Mr. Eric O'Connor
Page 3
November __, 2020

Michigan Franchise. This fee will be processed in two (2) installments for each Franchise location: A.) $25,000 upon successful permitting, and B.) $75,000 upon public opening of completed Franchise. ~~Steel Blue and Eric shall use commercially reasonable efforts to identify exceptional locations within the Michigan Development Area for Michigan Franchises and to cooperate with ROC Wash to coordinate the acquisition of real property and the development and construction and equipping of Michigan Franchises by ROC Wash. In consideration of such services, ROC Wash shall pay to Steel Blue a fee of $100,000 in cash upon the opening of each Michigan Franchise.~~ Subject to the execution and delivery of the Michigan Development Agreement and prior to commencing any of the services described in this Section, Steel Blue and Eric shall each enter into a non-competition, non-solicitation and confidentiality agreement with ROC Wash and TE Wash in the form attached hereto as Exhibit D~~C~~ (each, a "Non-Competition Agreement").

6.      Eric and Steel Blue represent, warrant, covenant and agree that  (a) Eric owns ~~and shall own a 100% membership~~ majority controlling interest in Steel Blue, free and clear of all liens and encumbrances, and that no person has or shall have any option or other right to acquire any part of such membership interest from him; (b) that no person other than Eric has or shall have the right (by contract or otherwise) to vote, or cause the voting of, or to dispose, or cause the disposition of, ~~his 100% membership interest in~~ Steel Blue; (c) there are and shall be no outstanding securities convertible into, exercisable to purchase or exchangeable for any membership interest  in Steel Blue; (d) neither Steel Blue's execution and delivery of this Agreement, nor the performance by it of its obligations hereunder, shall constitute a breach by Eric of his obligations (whether contractual, as an employee or otherwise) to the Franchisor or any of its Affiliates or to any other person; and (e) except as contemplated in this Agreement and in his capacity as an employee of the Franchisor or its affiliates, Eric is not engaged, and shall not engage during the term of this Agreement, directly or indirectly as officer, director, shareholder, member, manager, employee, consultant or otherwise, on his own behalf or on behalf of any other person in the development of Franchises in the State of Michigan.

7.      All of the parties acknowledge and agree that site location and acquisition for the Michigan Franchises and the construction and development of the Michigan Franchises are all difficult and complicated tasks, subject to a number of risks and uncertainties, and may not occur for a number of reasons. Accordingly, no party shall have any liability under this Agreement to any other party for any failure to successfully identify any site locations or acquire any such locations for the Michigan Franchises or to successfully construct or develop any Michigan Franchise.

8.      Subject to earlier termination in accordance with this Section, this Agreement shall expire when all of the Michigan Franchises required under the Michigan Development Schedule have been opened. This Agreement (a) shall terminate automatically without further action by any party upon the termination of the Michigan Development Agreement and (b) may be terminated (i) by the mutual written agreement of all of the parties at any time; or (ii) by ROC Wash and TE Wash on written notice to Steel Blue and Eric if (A) ROC Wash has not entered into the Michigan Development Agreement within 60 days after the date of this Agreement; (B) any of the representations and warranties made by Steel Blue or Eric in this Agreement, any Operating Agreement or any Non-Competition Agreement were false when made; or (C) Steel Blue or Eric

{8306782:4 }

FILED 9/2/2022
Justin F. Roebuck
20th Circuit Court

Mr. Eric O'Connor
Page 4
November __, 2020

breach any of their covenants or obligations under this Agreement, any Operating Agreement or any Non-Competition Agreement.

9.    This Agreement (including the exhibits hereto, which are incorporated herein by reference) constitutes the entire agreement among the parties with respect to the subject matter hereof is intended to supersede any prior written or oral agreements, representations or understandings, both written and oral, between the parties hereto with respect to the subject matter hereof.

10.    Neither this Agreement nor any provisions hereof shall be amended or waived, except by an instrument in writing signed by all of the parties.

11.    This Agreement may not be assigned by Steel Blue and Steel Blue may not delegate any of its obligations hereunder without the prior written consent of ROC Wash and TE Wash. Any assignment or delegation in violation of this section is null and void. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other person.

12.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to any principles of conflicts of laws that would result in the application of the law of any other jurisdiction. Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby. Any litigation arising from or relating to this Agreement shall be adjudicated in the federal courts of the Western District of New York or the New York State Supreme Court in Monroe County, New York and the parties hereto irrevocably consent to the exclusive jurisdiction and venue of such courts and waive any objection to venue. In the event of litigation to enforce the terms and conditions of this Agreement, the substantially losing party shall pay the costs and expenses, including reasonable attorneys' fees, of the substantially prevailing party.

13.    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement may also be executed and delivered by facsimile, pdf, or other means of electronic communication and in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[signature page follows]

{8306782:4 }

Mr. Eric O'Connor
Page 5
November __, 2020

Please indicate your agreement to the foregoing by executing this Agreement on the line provided below.

Very truly yours,

ROC Wash Holdings, LLC

By: _____
Name:  Charles L. Caranci, Jr.
Title:   Manager

TE Wash Holdings, LLC

By: _____
Name:  Charles L. Caranci, Jr.
Title:   Manager

Accepted and agreed to as of the date first written above:

STEEL BLUE VENTURES, LLC

By: _____
Name: Eric O'Connor
Title:

_____
Eric O'Connor, individually

{8306782:4 }



ROC Wash Holdings, LLC | 1170 Pittsford Victor Rd., Suite 260 | Pittsford, NY 14534 | Ph: 585.270.0941

<u>Exhibit A</u>
Form of Lease

{8306782:4 }

Exhibit B
~~Form of LLC Agreement~~
Terms of Lease

{8306782:4 }

FILED 9/2/2022
Justin F. Roebuck
20th Circuit Court

<u>Exhibit C</u>
<u>Form of LLC Agreement</u>

{8306782:4 }

Exhibit D
Form of Non-Competition Agreement

{8306782:4 }

FILED 9/2/2022
Justin F. Roebuck
20th Circuit Court

4

# EXHIBIT 4

FILED 9/2/2022
Justin F. Roebuck
20th Circuit Court

**Steel Blue**

 **Mike Czlonka** <mike.czlonka@kffmanagement.com>

To: Eric OConnor

Fri 12/31/2021 11:04 AM

Hi Boss,

FYI, you have three $25k steel blue checks that were paid this week enroute.  So be on the lookout for them.  Happy New Year!

Best,

Mike

Mike Czlonka | Manager
KFF Asset Management
mike.czlonka@kffmanagement.com
(585) 270-0925
1170 Pittsford Victor Rd, Suite 260
Pittsford, NY 14534

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

↩ Reply    → Forward

5

FILED 9/2/2022
Justin F. Roebuck
20th Circuit Court

# EXHIBIT 5

FILED 9/2/2022
Justin F. Roebuck
20th Circuit Court

**Operating Agreement**
**of**
**Iron Hammer Ventures, LLC**
**a Delaware Limited Liability Company**

THIS OPERATING AGREEMENT of Iron Hammer Ventures, LLC (the "Company") is entered into as of the date set forth on the signature page of this Agreement by each of the Members listed on Exhibit A of this Agreement.

A.     The Members have formed the Company as a Delaware limited liability company under the Delaware Limited Liability Company Act. The purpose of the Company is to conduct any lawful business for which limited liability companies may be organized under the laws of the state of Delaware. The Members hereby adopt and approve the articles of organization of the Company filed with the Director of the Delaware Department of Labor and Economic Growth.

B.     The Members enter into this Agreement to provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.

## ARTICLE 1: DEFINITIONS

Capitalized terms used in this Agreement have the meanings specified in this Article 1 or elsewhere in this Agreement and if not so specified, have the meanings set forth in the Delaware Limited Liability Company Act.

"Agreement" means this Operating Agreement of the Company, as may be amended from time to time.

"Capital Account" means, with respect to any Member, an account consisting of such Member's Capital Contribution, (1) increased by such Member's allocated share of income and gain, (2) decreased by such Member's share of losses and deductions, decreased by any distributions made by the Company to such Member, and otherwise adjusted as required in accordance with applicable tax laws.

"Capital Contribution" means, with respect to any Member, the total value of cash and the fair market value of property other than cash, and (2) services that are contributed and/ or agreed to be contributed to the Company by such Member, as listed on Exhibit A, as may be updated from time to time according to the terms of this Agreement.

"Managing Manager" means the Person who has authority to manage the business and affairs of the Company pursuant to this Agreement.

"Member" means each Person who acquires Membership Interest pursuant to this Agreement. The Members are listed on Exhibit A, as may be updated from time to time according to the terms of this Agreement. Each Member has the rights and obligations specified in this Agreement.

"Membership Interest" means the entire ownership interest of a Member in the Company at any particular time, including the right to any and all benefits to which a Member may be entitled as provided in this Agreement and under the Delaware Limited Liability Company Act, together with the obligations of the Member to comply with all of the terms and provisions of this Agreement.

"Ownership Interest" means the Percentage Interest, as applicable, based on the manner in which relative ownership of the Company is divided.

"Percentage Interest" means the percentage of ownership in the Company owned by each Member as set forth in Exhibit A, as may be amended from time to time pursuant to this Agreement.

"Person" means an individual (natural person), partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

"Voting Interest" shall mean the number of votes to which each Member is entitled on any vote brought before the Members, which shall be equal to the number of percentage points of Ownership Interest each Member bears as set forth in Exhibit A, as may abe amended from time to time pursuant to this Agreement.

## ARTICLE 2: CAPITAL CONTRIBUTIONS, ADDITIONAL MEMBERS, CAPITAL ACCOUNTS AND LIMITED LIABILITY

2.1    Initial Capital Contributions. The names of all Members and each of their respective addresses, initial Capital Contributions, and Ownership Interests must be set forth on Exhibit A. Each Member has made or agrees to make the initial Capital Contribution set forth next to such Member's name on Exhibit A to become a Member of the Company.

2.2    Subsequent Capital Contributions. Members are not obligated to make additional Capital Contributions unless unanimously agreed by all the Members. If subsequent Capital Contributions are unanimously agreed by all the Members, the Members shall make such additional Capital Contributions on a pro rata basis in accordance with each Member's respective Percentage Interest or as otherwise unanimously agreed by the Members.

2.3    Additional Members.

A.    With the exception of a transfer of interest (1) governed by Article 7 of this Agreement or (2) otherwise expressly authorized by this Agreement, additional Persons may become Members of the Company and be issued additional Ownership Interests only if approved by and on terms determined by unanimous agreement of the existing Members.

FILED 9/2/2022
Justin F. Roebuck
20th Circuit Court

B.      Before a Person may be admitted as a Member of the Company, that Person must sign and deliver to the Company the documents and instruments, in the form and containing the information required by the Company, that the Managers deem necessary or desirable. Membership Interests of new Members will be allocated according to the terms of this Agreement.

2.4     Capital Accounts. Individual Capital Accounts must be maintained for each Member, unless (a) there is only one Member of the Company and (b) the Company is exempt according to applicable tax laws. Capital Accounts must be maintained in accordance with all applicable tax laws.

2.5     Interest. No interest will be paid by the Company or otherwise on Capital Contributions or on the balance of a Member's Capital Account.

2.6     Limited Liability; No Authority. A Member will not be bound by, or be personally liable for, the expenses, liabilities, debts, contracts, or obligations of the Company, except as otherwise provided in this Agreement or as required by the Delaware Limited Liability Company Act. Unless expressly provided in this Agreement, no Member, acting alone, has any authority to undertake or assume any obligation, debt, or responsibility, or otherwise act on behalf of, the Company or any other Member.

## ARTICLE 3: ALLOCATIONS AND DISTRIBUTIONS

3.1     Allocations. Unless otherwise agreed to by the majority of the Members any income, gain, loss, deduction, or credit of the Company will be allocated for accounting and tax purposes on a pro rata basis in proportion to the respective Percentage Interest held by each Member and in compliance with applicable tax laws.

3.2     Distributions. The Company will have the right to make distributions of cash and property to the Members on a pro rata basis in proportion to the respective Percentage Interest held by each Member. The timing and amount of distributions will be determined by the Manager in accordance with the Delaware Limited Liability Company Act, provided that not later than ninety (90) days following the end of the Company's fiscal year, the Company shall make a distribution to each Member in proportion to its Membership Interest in an amount necessary to cover any taxes due from such Member (or such Member's principal(s)) to federal, state, or local tax authorities as a result of such Member's Membership Interest.

3.3     Limitations on Distributions. The Company must not make a distribution to a Member if, after giving effect to the distribution:

A.      The Company would be unable to pay its debts as they become due in the usual course of business; or

B.      The fair value of the Company's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of Members, if any, whose preferential rights are superior to those of the Members receiving the distribution.

## ARTICLE 4: MANAGEMENT

**4.1**    Management.

A.      Generally. Subject to the terms of this Agreement and the Delaware Limited Liability Company Act, the business and affairs of the Company will be managed by the Manager, who shall be selected by the vote of a majority of the Voting Interests. The Company shall have not less than one (1) manager.

B.      Certain Decisions Requiring Member Approval. The following matters require unanimous approval of the Members to constitute an act of the Company:

(i)      A material change in the purposes or the nature of the Company's business;

(ii)     With the exception of a transfer of interest governed by Article 7 of this Agreement, the admission of a new Member or a change in any Member's Membership Interest, Ownership Interest, Percentage Interest, or Voting Interest in any manner other than in accordance with this Agreement;

(iii)    The merger of the Company with any other entity or the sale of all or substantially all of the Company's assets; and

(iv)     The amendment of this Agreement.

**4.2**    Meetings. Regular meetings of the Members or the Managers are not required but may be held at such time and place as the Members  or Managers, respectively deem necessary. Meetings may take place in person, by conference call, or by any other means permitted under the Delaware Limited Liability Company Act. In addition, Company actions requiring a vote may be carried out without a meeting if all of the members consent in writing to approve the action.

**4.3**    Officers. The members are authorized to appoint one or more officers from time to time. The officers will have the titles, the authority, exercise the powers, and perform the duties that the members determine from time to time. Each officer will continue to perform

and hold office until such time as (a) the officer's successor is chosen and appointed by the members; or (b) the officer is dismissed or terminated by the members, which termination will be subject to applicable law and, if an effective employment agreement exists between the officer and the Company, the employment agreement. Subject to applicable law and the employment agreement (if any), each officer will serve at the direction of Managing Manager, and may be terminated, at any time and for any reason, by the Managing Manager.

## ARTICLE 5: ACCOUNTS AND ACCOUNTING

5.1    Accounts. The Company must maintain complete accounting records of the Company's business, including a full and accurate record of each Company transaction. The records must be kept at the Company's principal executive office and must be open to inspection and copying by Members during normal business hours upon reasonable notice by the Members wishing to inspect or copy the records or their authorized representatives, for purposes reasonably related to the Membership Interest of such Members. The costs of inspection and copying will be borne by the respective Member.

5.2    Records. The Manager will keep or cause the Company to keep the following business records.

A.    An up-to-date list of the Members, each of their respective full legal names, last known business or residence address, Capital Contributions, the amount and terms of any agreed upon future Capital Contributions, and Ownership Interests, and Voting Interests;

B.    A copy of the Company's federal, state, and local tax information and income tax returns and reports, if any, for the six most recent taxable years;

C.    A copy of the articles of organization of the Company, as may be amended from time to time ("Articles of Organization"); and

D.    An original signed copy, which may include counterpart signatures, of this Agreement, and any amendments to this Agreement, signed by all then-current Members.

5.3    Income Tax Returns. Within 45 days after the end of each taxable year, the Company will use its best efforts to send each of the Members all information necessary for the Members to complete their federal and state tax information, returns, and reports and a copy of the Company's federal, state, and local tax information or income tax returns and reports for such year.

5.4    Subchapter S Election. The Company may, upon unanimous consent of the Members, elect to be treated for income tax purposes as an S Corporation. This designation may be changed as permitted under the Internal Revenue Code Section 1362(d) and applicable Regulation(s).

5.5    Tax Matters Member. Anytime the Company is required to designate or select a tax matters partner or partnership representative, pursuant to Section 6223 of the Internal Revenue Code and any regulations issued by the Internal Revenue Service, the Members must designate one of the Members as the tax matters partner or partnership representative of the Company and keep such designation in effect at all times.

5.6    Banking. All funds of the Company must be deposited in one or more bank accounts in the name of the Company with one or more recognized financial institutions. The Managing Manager is authorized to establish such accounts and complete, sign, and deliver any banking resolutions reasonably required by the respective financial institutions in order to establish an account.

## ARTICLE 6: MEMBERSHIP - VOTING AND MEETINGS

6.1    Members and Voting Rights. The Members have the right and power to vote on all matters with respect to which the Articles of Organization, this Agreement, or the Delaware Limited Liability Company Act requires or permits. Unless otherwise stated in this Agreement (for example, in Section 4.1(c)) or required under the Delaware Limited Liability Company Act, the vote of the Members holding at least a majority of the Voting Interest of the Company is required to approve or carry out an action.

6.2    Meetings of Members. Annual, regular, or special meetings of the Members are not required but may be held at such time and place as the Members deem necessary or desirable for the reasonable management of the Company. A written notice setting forth the date, time, and location of a meeting must be sent at least ten (10) days but no more than sixty (60) days before the date of the meeting to each Member entitled to vote at the meeting. A Member may waive notice of a meeting by sending a signed waiver to the Company's principal executive office or as otherwise provided in the Delaware Limited Liability Company Act. In any instance in which the approval of the Members is required under this Agreement, such approval may be obtained in any manner permitted by the Delaware Limited Liability Company Act, including by conference call or similar communications equipment. Any action that could be taken at a meeting may be approved by a consent in writing that describes the action to be taken and is signed by Members holding the minimum Voting Interest required to approve the action. If any action is taken without a meeting and without unanimous written consent of the Members, notice of such action must be sent to each Member that did not consent to the action.

## ARTICLE 7: WITHDRAWAL AND TRANSFERS OF MEMBERSHIP INTERESTS

7.1    Withdrawal. Members may withdraw from the Company prior to the dissolution and winding up of the Company (a) by transferring or assigning all of their respective Membership Interests pursuant to Section 7.2 below, or (b) if all of the Members unanimously agree in a written consent. Subject to the provisions of Article 3, a Member that withdraws pursuant to this Section 7.1 will be entitled to a distribution from the Company in an amount equal to such Member's Capital Account.

7.2    Restrictions on Transfer; Admission of Transferee. A Member may not transfer any Membership Interests, whether now owned or later acquired, unless Members holding all of the Percentage Interests not subject to transfer consent to such transfer. A person may acquire Membership Interests directly from the Company upon the written consent of all Members. A Person that acquires Membership Interests in accordance with this Section 7.2 will be admitted as a Member of the Company only after the requirements of Section 2.3(b) are complied with in full.

## ARTICLE 8: DISSOLUTION

8.1    Dissolution. The Company will be dissolved upon the first to occur of the following events:

A.    The unanimous agreement of all Members in a consent in writing to dissolve the Company;

B.    Entry of a decree of judicial dissolution under Section 450-4802 of the Delaware Limited Liability Company Act;

C.    At any time that there are no Members, unless and provided that the Company is not otherwise required to be dissolved and wound up, within 90 days after the occurrence of the event that terminated the continued membership of the last remaining Member, the legal representative of the last remaining Member agrees in writing to continue the Company and (i) to become a Member; or (ii) to the extent that the last remaining Member assigned its interest in the Company, to cause the Member's assignee to become a Member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member;

D.    The sale or transfer of all or substantially all of the Company's assets;

E.    A merger or consolidation of the Company with one or more entities in which the Company is not the surviving entity.

8.2    No Automatic Dissolution Upon Certain Events. Unless otherwise set forth in this Agreement or required by applicable law, the death, incapacity, disassociation, bankruptcy, or withdrawal of a Member will not automatically cause a dissolution of the Company.

## ARTICLE 9: INDEMNIFICATION

9.1    Indemnification. The Company has the power to defend, indemnify, and hold harmless any Person who was or is a party, or who is threatened to be made a party, to any Proceeding (as that term is defined below) by reason of the fact that such Person was or is a Member, Manager, officer, employee, representative, or other agent of the Company, or was or is serving at the request of the Company as a director, Manager, Governor, officer,

OPERATING AGREEMENT OF IRON HAMMER VENTURES, LLC                    PAGE 7 OF 11

FILED 9/2/2022
Justin F. Roebuck
20th Circuit Court

employee, representative or other agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise (each such Person is referred to as a "Company Agent"), against Expenses (as that term is defined below), judgments, fines, settlements, and other amounts (collectively, "Damages") to the maximum extent now or hereafter permitted under Michigan law. "Proceeding," as used in this Article 9, means any threatened, pending, or completed action, proceeding, individual claim or matter within a proceeding, whether civil, criminal, administrative, or investigative. "Expenses," as used in this Article 9, includes, without limitation, court costs, reasonable attorney and expert fees, and any expenses incurred relating to establishing a right to indemnification, if any, under this Article 9.

9.2    Mandatory. The Company must defend, indemnify and hold harmless a Company Agent in connection with a Proceeding in which such Company Agent is involved if, and to the extent, Michigan law requires that a limited liability company indemnify a Company Agent in connection with a Proceeding.

9.3    Expenses Paid by the Company Prior to Final Disposition. Expenses of each Company Agent indemnified or held harmless under this Agreement that are actually and reasonably incurred in connection with the defense or settlement of a Proceeding may be paid by the Company in advance of the final disposition of a Proceeding if authorized by a vote of the Members that are not seeking indemnification holding a majority of the Voting Interests (excluding the Voting Interest of the Company Agent seeking indemnification) or a majority of the members that are not seeking indemnification, as the case may be. Before the Company makes any such payment of Expenses, the Company Agent seeking indemnification must deliver a written undertaking to the Company stating that such Company Agent will repay the applicable Expenses to the Company unless it is ultimately determined that the Company Agent is entitled or required to be indemnified and held harmless by the Company (as set forth in Sections 9.1 or 9.2 above or as otherwise required by applicable law).

## ARTICLE 10: GENERAL PROVISIONS

10.1    Notice.    (a)    Any    notices    (including    requests,    demands,    or    other communications) to be sent by one party to another party in connection with this Agreement must be in writing and delivered personally, by reputable overnight courier, or by certified mail (or equivalent service offered by the postal service from time to time) to the following addresses or as otherwise notified in accordance with this Section: (i) if to the Company, notices must be sent to the Company's principal executive office; and (ii) if to a Member, notices must be sent to the Member's last known address for notice on record. (b) Any party to this Agreement may change its notice address by sending written notice of such change to the Company in the manner specified above. Notice will be deemed to have been duly given as follows: (i) upon delivery, if delivered personally or by reputable overnight carrier or (ii) five days after the date of posting if sent by certified mail.

10.2    Entire Agreement; Amendment. This Agreement along with the Articles of Organization (together, the "Organizational Documents"), constitute the entire agreement among the Members and replace and supersede all prior written and oral

OPERATING AGREEMENT OF IRON HAMMER VENTURES, LLC                    PAGE 8 OF 11

understandings and agreements with respect to the subject matter of this Agreement, except as otherwise required by the Delaware Limited Liability Company Act. There are no representations, agreements, arrangements, or undertakings, oral or written, between or among the Members relating to the subject matter of this Agreement that are not fully expressed in the Organizational Documents. This Agreement may not be modified or amended in any respect, except in a writing signed by all of the Members, except as otherwise required or permitted by the Delaware Limited Liability Company Act.

10.3   Governing Law; Severability. This Agreement will be construed and enforced in accordance with the laws of the state of Michigan. If any provision of his Agreement is held to be unenforceable by a court of competent jurisdiction for any reason whatsoever, (i) the validity, legality, and enforceability of the remaining provisions of this Agreement (including without limitation, all portions of any provisions containing any such unenforceable provision that are not themselves unenforceable) will not in any way be affected or impaired thereby, and (ii) to the fullest extent possible, the unenforceable provision will be deemed modified and replaced by a provision that approximates the intent and economic effect of the unenforceable provision and the Agreement will be deemed amended accordingly.

10.4   Further Action. Each Member agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

10.5   No Third-Party Beneficiary. This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other Person or entity will have or acquire any right by virtue of this Agreement. This Agreement will be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

10.6   Incorporation by Reference. The recitals and each appendix, exhibit, schedule, and other document attached to or referred to in this Agreement are hereby incorporated into this Agreement by reference.

10.7   Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all of the Members signed the same copy. All counterparts will be construed together and will constitute one agreement.

[SIGNATURE PAGE FOLLOWS]

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

OPERATING AGREEMENT OF IRON HAMMER VENTURES, LLC                    PAGE 9 OF 11

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Operating Agreement and do each hereby represent and warrant that their respective signatory, whose signature appears below, has been and is, on the date of this Agreement, duly authorized to execute this Agreement.

**Steel Blue Ventures, LLC**

Date: July 8th, 2021

*Eric O'Connor*

By: Eric O'Connor, its Manager

**Loyalist Ventures, LLC**

Date: 03/10/2021

*Blake Peterson*

By: Blake Peterson, its Managing Member

The Company: **Iron Hammer Ventures, LLC**

Date: July 8th, 2021

*Eric O'Connor*

By: Eric O'Connor, its Manager

<u>EXHIBIT A</u>
to Operating Agreement of
Iron Hammer Ventures, LLC

The Members of the Company and their respective addresses, Capital Contributions, and Ownership Interests are set forth below. The Members agree to keep this Exhibit A current and updated in accordance with the terms of this Agreement:

| Member's Name and Address | Initial Capital Contribution | Membership Interest |
|---|---|---|
| Steel Blue Ventures, LLC<br>4027 Tom Morris Drive<br>Belmont, MI 49306 | $750.00 | 75% |
| Loyalist Ventures, LLC<br>527 Fern Gelen<br>La Jolla, CA 92307 | $250.00 | 25% |

FILED 9/2/2022
Justin F. Roebuck
20th Circuit Court



FILED 9/2/2022
Justin F. Roebuck
20th Circuit Court

# EXHIBIT 6

June 22, 2021


Mr. Eric O'Connor & Mr. Reymond A. Sargenti
Gulf Coast Car Wash Consultants, LLC
10951 Saxum Drive
Fort Myers, FL 33908

Re:     Joint Venture for Development of Tommy's Express Car Washes in Lee and Collier County,
Florida

Dear Eric:

This letter agreement (this "Agreement") sets forth the terms and conditions on which ROC Wash Holdings, LLC, a Delaware limited liability company ("ROC Wash"), TE Wash Holdings, LLC, a Delaware limited liability company ("TE Wash"), Gulf Coast Car Wash Consultants, LLC, a Florida limited liability company ("Gulf Coast") Eric O'Connor (Eric) and Reymond Sargenti (Ray)shall jointly develop Tommy's Express car wash franchises ("Franchises") in Lee and Collier County, Florida.

ROC Wash and TE Wash were formed on June 30, 2020 for the purpose of developing, owning and operating Tommy's Express Franchise Car Washes. To date, ROC Wash has entered into Multi-Unit Development Agreements with Tommy's Express, LLC, a Michigan limited liability company (the "Franchisor"), pursuant to which ROC Wash has been granted, on the terms and subject to the conditions set forth therein, exclusive rights to develop Franchises in specified counties in Pennsylvania, West Virginia, Oklahoma, Michigan, Connecticut and North Carolina.

Eric is employed by the Franchisor as its Director of Franchise Development and has advised ROC Wash of the opportunity to develop Franchises in Southwestern Florida. Eric's experience with the Franchisor, and with the car wash industry make him uniquely suited to join with ROC Wash in the development of Franchises there.

Reymond Sargenti (Ray) is a franchise partner in Lee County and at the time of the execution of this agreement, owns and operates two Tommy's Express franchise car washes. In addition, Ray represents that he owns the development rights to portions of Lee and Collier Counties, in the State of Florida. The areas of development are described in Exhibit E.

In consideration of the foregoing, the covenants and agreements set forth below, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Gulf Coast and ROC Wash will use commercially reasonable efforts to enter into a Florida Development Agreement (the "Florida Development Agreement"), on the terms and subject to the conditions set forth therein, the exclusive rights to develop Franchises in portions of Lee and Collier Counties, in the state of Florida (the territory in which Ray is granted the exclusive right to develop Franchises under the Multi Unit Development Agreement ("Sargenti Development Area" ) and Franchises developed under the Multi-Unit Development Agreement are "Florida Franchises").

2.      Subject to the execution and delivery of the Joint Agreement, ROC Wash shall use commercially reasonable efforts to develop Florida Franchises in the Sargenti Development Area in accordance with the development schedule set forth in the Multi-Unit Development Agreement (the "Multi-Unit Development Schedule"); provided, however, that ROC Wash shall have no obligation to develop

Fla JVLOA v0fin061521

more than ten (10) Florida Franchises unless and until the following performance targets are achieved (the "Florida Franchise Performance Targets"):

    (i)   the average number of annual memberships sold by the first ten (10) Florida Franchises for the most recently completed fiscal year is equal to or greater than 3,000 per Florida Franchise; and

    (ii)  each of the first ten (10) Florida Franchises has annual net operating income, before debt service (i.e., rent), greater than or equal to 40% of its annual total revenue for the most recently completed fiscal year.

3.      Each Florida Franchise shall be developed on real property owned or leased by a newly formed wholly-owned subsidiary of ROC Wash (each a "Real Property Company"). ROC Wash shall bear all costs of acquiring the real property on which any Florida Franchise is to be developed and all costs of developing, constructing and fully equipping each Florida Franchise so that it can be leased on a turn-key basis to the Operating Company. Each Florida Franchise shall be operated by a newly-formed Delaware limited liability company owned (as described in more detail below) by TE Wash and Gulf Coast (each an "Operating Company") under a triple net lease by and between the applicable Real Property Company and Operating Company in the form attached hereto as Exhibit A. This lease must be approved by Tommy's Express, LLC franchise development department. The general business terms of the lease are outlined in Exhibit A (General Business Lease Terms) of this agreement.

4.      Each Operating Company shall be governed by a limited liability company agreement in the form attached hereto as Exhibit B (each an "LLC Agreement"). Each of the first ten (10) Operating Companies shall be owned 50% by TE Wash and 50% by Gulf Coast. Each Operating Company in addition to the first ten (10),if any, shall be owned 50% by TE Wash and 50% by Gulf Coast.

5.      Gulf Coast shall use commercially reasonable efforts to identify exceptional locations within the Multi-Unit Development Area for Florida Franchises and to cooperate with ROC Wash to coordinate the acquisition of real property and the development and construction and equipping of Florida Franchises by ROC Wash. In consideration of such services, ROC Wash shall pay to Gulf Coast a fee of $150,000 for the development of each Florida Franchise. This fee will be processed in three (3) installments for each Franchise location:

    a.   $25,000 upon successful acquisition of real property for purpose of developing a Florida Franchise

    b.   $25,000 upon successful permitting of real property for purpose of developing a Florida Franchise

    c.   $100,000 upon receiving certificate of occupancy or temporary certificate of occupancy to allow for public opening of completed Franchise.

6.      Subject to the execution and delivery of this Joint Agreement and prior to commencing any of the services described in this Section, Ray and Gulf Coast shall each enter into a non-competition within a 3 mile radius of any Florida Franchise in Lee and Collier counties, FL, non-solicitation and confidentiality agreement with ROC Wash and TE Wash in the form attached hereto as Exhibit D. 1 (each, a "Non-Competition Agreement"). Separately, ROC Wash and TE Wash shall enter into a non-competition within a 3-mile radius of Ray's car washes within Lee and Collier counties, FL, non-solicitation and confidentiality agreement with Ray's business entities in the form attached hereto as Exhibit D. 2. Additionally, Ray

Fla JVLOA v0fin061521

maintains control of the Multi-Unit Development Agreement and retains authority to approve all Florida Franchise locations within Lee and Collier counties, FL.

7.     Gulf Coast represent, warrant, covenant and agree that  (a) Eric and Ray own majority controlling interest in Gulf Coast, free and clear of all liens and encumbrances, and that no person has or shall have any option or other right to acquire any part of such membership interest from either; (b) that no person other than Eric and Ray has or shall have the right (by contract or otherwise) to vote, or cause the voting of, or to dispose, or cause the disposition of, their membership interest in Gulf Coast; (c) there are, and shall be, no outstanding securities convertible into, exercisable to purchase, or exchangeable for any membership interest  in Gulf Coast; (d) neither Gulf Coast's execution and delivery of this Agreement, nor the performance by it of its obligations hereunder, shall constitute a breach by Eric or Ray of their obligations (whether contractual, as an employee, franchise partner, or otherwise) to the Franchisor or any of its Affiliates or to any other person.

8.     All of the parties acknowledge and agree that site location and acquisition for the Florida Franchises and the construction and development of the Florida Franchises are all difficult and complicated tasks, subject to a number of risks and uncertainties, and may not occur for a number of reasons. Accordingly, no party shall have any liability under this Agreement to any other party for any failure to successfully identify any site locations or acquire any such locations for the Florida Franchises or to successfully construct or develop any Florida Franchise.

9.     Subject to earlier termination in accordance with this Section, this Agreement shall expire when all of the Florida Franchises required under the Multi-Unit Development Schedule have been opened. This Agreement (a) shall terminate automatically without further action by any party upon the termination of the Multi-Unit Development Agreement and (b) may be terminated (i) by the mutual written agreement of all of the parties at any time; or (ii) by ROC Wash and TE Wash on written notice to Gulf Coast and Eric and Ray if (A) any of the representations and warranties made by Gulf Coast, Ray or Eric in this Agreement, any Operating Agreement or any Non-Competition Agreement were false when made; or (B) Gulf Coast, Ray or Eric breach any of their covenants or obligations under this Agreement, any Operating Agreement or any Non-Competition Agreement.

10.    This Agreement (including the exhibits hereto, which are incorporated herein by reference) constitutes the entire agreement among the parties with respect to the subject matter hereof is intended to supersede any prior written or oral agreements, representations or understandings, both written and oral, between the parties hereto with respect to the subject matter hereof.

11.    Neither this Agreement nor any provisions hereof shall be amended or waived, except by an instrument in writing signed by all of the parties.

12.    This Agreement may not be assigned by Gulf Coast and Gulf Coast may not delegate any of its obligations hereunder without the prior written consent of ROC Wash and TE Wash. Any assignment or delegation in violation of this section is null and void. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other person.

13.    This Agreement shall be governed by and construed in accordance with the laws of the State of Florida without regard to any principles of conflicts of laws that would result in the application of the law of any other jurisdiction. Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby. Any litigation arising from or relating to this Agreement shall be adjudicated in the federal courts of Lee County, FL or the Florida State Supreme Court

Fla JVLOA v0fin061521

and the parties hereto irrevocably consent to the exclusive jurisdiction and venue of such courts and waive any objection to venue. In the event of litigation to enforce the terms and conditions of this Agreement, the substantially losing party shall pay the costs and expenses, including reasonable attorneys' fees, of the substantially prevailing party.

14.    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement may also be executed and delivered by facsimile, pdf, or other means of electronic communication and in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[signature page follows]

Fla JVLOA v0fin061521

FILED 9/2/2022
Justin F. Roebuck
20th Circuit Court

Please indicate your agreement to the foregoing by executing this Agreement on the line provided below.

Very truly yours,

ROC Wash Holdings, LLC


By: _____
Name:  Charles L. Caranci, Jr.
Title:   Manager


TE Wash Holdings, LLC


By: _____
Name:  Charles L. Caranci, Jr.
Title:   Manager


Accepted and agreed to as of the date first written above:

GULF COAST CAR WASH CONSULTANTS, LLC


By: _____
Name: Eric O'Connor
Title:   Managing Member


_____
Eric O'Connor, individually


By: _____
Name: Reymond Sargenti
Title:   Managing Member


_____
Reymond Sargenti, individually


Fla JVLOA v0fin061521

STATE OF MICHIGAN
OTTAWA COUNTY CIRCUIT COURT

TOMMY'S EXPRESS, LLC, a Michigan
Limited Liability Corporation, and
TOMMY CAR WASH SYSTEMS, INC., a
Michigan Corporation,

        Plaintiffs,

v

ERIC O'CONNOR, an individual, and
STEEL BLUE VENTURES, LLC, a
Delaware limited liability company,

        Defendants.

Case No. 2022- **6989** -CB

Hon.
    **JON A. VAN ALLSBURG**

Dean F. Pacific (P57086)
Warner Norcross + Judd LLP
150 Ottawa Avenue NW, Suite 1500
Grand Rapids, MI 49503
616.752.2000
dpacific@wnj.com
*Attorneys for Plaintiffs*

---

### JURY DEMAND

Plaintiffs Tommy's Express, LLC and Tommy Car Wash Systems, Inc., hereby demands

a trial by jury on all claims so triable in this action.

Respectfully submitted,

WARNER NORCROSS + JUDD LLP

Dated:  September 2, 2022      By_____

Dean F. Pacific (P57086)
WARNER NORCROSS + JUDD LLP
150 Ottawa Avenue NW, Suite 1500
Grand Rapids, MI 49503
616.752.2000
dpacific@wnj.com
Attorneys for Plaintiff

FILED 9/2/2022
Justin F. Roebuck
20th Circuit Court

## STATE OF MICHIGAN
## IN THE 20th CIRCUIT COURT FOR THE COUNTY OF OTTAWA

414 Washington Street, Room 320, Grand Haven, MI 49417                     616-846-8315

**TOMMY'S EXPRESS, LLC,** a Michigan Limited Liability Corporation, and **TOMMY CAR WASH SYSTEMS, INC**., a Michigan Corporation,

         Plaintiffs,

v.

**FILE NO.   2022-6989-CB**


HON. JON A. VAN ALLSBURG

**ERIC O'CONNOR,** an individual, and **STEEL BLUE VENTURES, LLC**, a Delaware limited liability company,

         Defendants.

**NOTICE OF ACCEPTANCE TO THE BUSINESS COURT**

Please take notice that this case has been assigned to the Business Court docket of the 20th Circuit Court of the County of Ottawa.

To:    **DEAN F. PACIFIC**
        Attorney for Plaintiff
        WARNER NORCROSS & JUDD LLP
        150 OTTAWA AVENUE NW, SUITE 1500
        GRAND RAPIDS, MI  49503
        dpacific@wnj.com

I hereby certify that a copy of the Notice of Acceptance to the 20th Circuit, County of Ottawa Business Court Docket was e-mailed to the attorney of record in this case on the 2nd day of SEPTEMBER, 2022.


*JUSTIN F. ROEBUCK*
OTTAWA COUNTY CLERK/REGISTER OF DEEDS

By:

09/02/2022
4:39 PM
BARBARA HOLT - DEPUTY COUNTY CLERK
OTTAWA COUNTY - E-SIGNATURE

| | Original - Court | 2nd copy - Plaintiff |
|---|---|---|
| | 1st copy - Defendant | 3rd copy - Return |

| STATE OF MICHIGAN | | SUMMONS | CASE NO. |
|---|---|---|---|
| 20th | JUDICIAL DISTRICT JUDICIAL CIRCUIT COUNTY PROBATE | | 2022—6989—CB |

JON A. VAN ALLSBURG

**Court address**
414 Washington Ave., Grand Haven, MI 49417

**Court telephone no.**
(616) 846-8320

| Plaintiff's name(s), address(es), and telephone no(s). | | Defendant's name(s), address(es), and telephone no(s). |
|---|---|---|
| Tommy's Express, LLC and Tommy's Car Wash Systems, Inc. 581 Ottawa Ave, Suite 300 Holland, MI 49423 | v | Eric O'Connor 14800 Lake Olive Drive Fort Myers, FL 33919 Steel Blue Ventures, LLC c/o Zenbusiness, Inc., Registered Agent 611 South Dupont Highway, Ste. 102 Dover, DE 19901 |

| Plaintiff's attorney, bar no., address, and telephone no. |
|---|
| Dean F. Pacific (P47086) Warner Norcross + Judd LLP 150 Ottawa Ave. NW, Ste. 1500 Grand Rapids, MI 49503 616-752-2424 |

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

## Domestic Relations Case

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

## Civil Case

☑ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____ .

The action ☐ remains ☐ is no longer   pending.

Summons section completed by court clerk.    **SUMMONS**

**NOTICE TO THE DEFENDANT**: In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date SEP 02 2022 | Expiration date* DEC. 2, 2022 | Court clerk JUSTIN F. ROEBUCK | by Barb Holt |
|---|---|---|---|

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

Deputy Clerk

MC 01 (9/19) **SUMMONS**                MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

**SUMMONS**

Case No. 2022-*6989-CB*

**PROOF OF SERVICE**

TO PROCESS SERVER: You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

**CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE**

| ☐ **OFFICER CERTIFICATE** | OR | ☐ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that: (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult, and I am not a party or an officer of a corporate party (MCR 2.103[A]), and that: (notarization required) |

☐ I served personally a copy of the summons and complaint,

☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with _____
List all documents served with the summons and complaint

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled  Fee $ | | Signature |
|---|---|---|---|
| Incorrect address fee $ | Miles traveled  Fee $ | TOTAL FEE $ | Name (type or print) |
| | | | Title |

Subscribed and sworn to before me on _____ , _____ County, Michigan.
                                        Date

My commission expires: _____  Signature: _____
                          Date                        Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

**ACKNOWLEDGMENT OF SERVICE**

I acknowledge that I have received service of the summons and complaint, together with _____
                                                                                    Attachments

_____ on _____
                                    Day, date, time

_____ on behalf of _____ .

Signature

| **SUMMONS** |
| Case No. 2022- 6989-CB |

**PROOF OF SERVICE**

TO PROCESS SERVER: You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

## CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE

| ☐ **OFFICER CERTIFICATE** | OR | ☒ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that: (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult, and I am not a party or an officer of a corporate party (MCR 2.103[A]), and that: (notarization required) |

☐ I served personally a copy of the summons and complaint,

☒ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with ___Jury Demand, Notice of Acceptance to the Business Court___
List all documents served with the summons and complaint

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| Eric O'Connor | 14800 Lake Olive Drive, Fort Myers, FL 33919 | Saturday, 9/10/22 @ 10:41 a.m. |
| Steel Blue Ventures, LLC c/o Eric O'Connor | 14800 Lake Olive Drive, Fort Myers, FL 33919 | Friday, 9/16/22 @ 10:28 a.m. |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled Fee $ | | Signature Jayne M. Scott |
|---|---|---|---|
| Incorrect address fee $ | Miles traveled Fee $ | **TOTAL FEE** $ | Name (type or print) Administrative Assistant |

Title

Subscribed and sworn to before me on ___9/23/22___ , ___Kent___ County, Michigan.
Date

My commission expires: ___8/23/26___   Signature: ___Susan R. Acklin___
Date    Deputy court clerk/Notary public  Susan R. Acklin

Notary public, State of Michigan, County of ___Kent, Acting in Kent___ County

## ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of the summons and complaint, together with _____
Attachments

_____ on _____
Day, date, time

_____ on behalf of _____

Signature

document received by the MI Ottawa 20th Circuit Court.

**Tracking Number:**

**70201290000079511101**

 Copy    Add to Informed Delivery

**Latest Update**

Your item was delivered to an individual at the address at 10:41 am on September 10, 2022 in FORT MYERS, FL 33919.

✅ **Delivered**
**Delivered, Left with Individual**
FORT MYERS, FL 33919
September 10, 2022, 10:41 am

**See All Tracking History**

---

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Eric O'Connor
14800 Lake Olive Drive
Fort Myers, FL  33919

9590 9402 7499 2098 9994 85

2. Article Number *(Transfer from service label)*

7020 1290 0000 7951 1101

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X  E. Oconner
☐ Agent
☐ Addressee

B. Received by *(Printed Name)*    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ ...Delivery Restricted Delivery
☐ ...ured Mail Restricted Delivery
   (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

...ument received by the MI Ottawa 20th Circuit Court.

**Tracking Number:**

## 70191640000209150281

 Copy     Add to Informed Delivery

**Latest Update**

Your item was delivered to an individual at the address at 10:28 am on September 16, 2022 in FORT MYERS, FL 33919.

 **Delivered**
**Delivered, Left with Individual**
FORT MYERS, FL 33919
September 16, 2022, 10:28 am

**See All Tracking History**

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. <br> ■ Print your name and address on the reverse so that we can return the card to you. <br> ■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature <br> X Ɛ O'connor  ☐ Agent  ☐ Addressee <br> B. Received by (Printed Name)   C. Date of Delivery |
| 1. Article Addressed to: <br><br> Steel Blue Ventures, LLC <br> c/o Eric O'Connor <br> 14800 Lake Olive Drive <br> Fort Myers, FL  33919 | D. Is delivery address different from item 1?  ☐ Yes <br> If YES, enter delivery address below:  ☐ No |
| ‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖ <br> 9590 9402 7068 1251 6348 92 | 3. Service Type <br> ☐ Adult Signature <br> ☐ Adult Signature Restricted Delivery <br> ☐ Certified Mail® <br> ☐ Certified Mail Restricted Delivery <br> ☐ Collect on Delivery <br> ☐ Collect on Delivery Restricted Delivery <br> ☐ Restricted Delivery | ☐ Priority Mail Express® <br> ☐ Registered Mail™ <br> ☐ Registered Mail Restricted Delivery <br> ☐ Signature Confirmation™ <br> ☐ Signature Confirmation Restricted Delivery |
| 2. Article Number (Transfer from service label) <br> 7019 1640 0002 0915 0281 | |
| PS Form 3811, July 2020 PSN 7530-02-000-9053 | Domestic Return Receipt |

...ument received by the MI Ottawa 20th Circuit Court.